IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | Case No. 1:23-cr-00298-JEB |
| | : | |
| DOUGLAS HARRINGTON, | : | |
| | : | |
| Defendant. | : | |

## UNITED STATES' TRIAL BRIEF

The United States, by and through its attorney, the U.S. Attorney for the District of Columbia, submits this trial brief to summarize the facts of this case and anticipated issues for trial.

## FACTUAL BACKGROUND

On January 6, 2021, a mob of violent rioters attacked the U.S. Capitol while a joint session of Congress met to certify the results of the 2020 presidential election. Douglas Harrington was among the rioters. Harrington remained on the restricted Capitol grounds for hours, assaulted a police officer with a metal flagpole, joined with others to push a cardboard sign into the police line, grabbed at officer's baton, and resisted the police officers' efforts to clear the grounds. The defendant's text messages show that he was disgruntled by the results of the 2020 election, that he planned to be in Washington, D.C. on January 6, 2021, and that he thought violence was necessary and appropriate.

In the days and weeks following the 2020 presidential election, the defendant sent text messages to associates asserting that the electoral outcome was the result of fraud. On November 8, 2020, he wrote, "We are seeing satin cheeting and we have no power to do anything other than start calling tbe Republican senators and rep to have them start protesting the fake stealing of our

votes." On November 17, 2020, he wrote "Im waiting for the courts to finish before I get involved" while at the same time expressing that his involvement would include "Kicking down punks and crippling them hurting them so they know who's street it belongs too ITS WE THE PEOPLE THE TAXPAYERS[.]" On November 21, 2020, he wrote "nothing short other than real war . . .will come jan5[.]" On December 13, 2020, while discussing preparations with an associate, he wrote "since we got the government is watching everything at this point don't discuss weapons or anything in planning online." On December 19, 2020, he wrote, "im going out to DC to fight for our country's integrity if biden gets in we have but allowed satin free pass to lie cheet steal . . . 6 JANUARY 2021 IS THE DAY WE MARCH ON WASHINGTON DC THE WHOLE REASON FOR FREEDOM IS SOMEONES BLOOD PAYS THE PRICE[.]" On December 22, 2020, he wrote, "THE ENEMY IS THE UNITED STATES CONGRESS BOTH HOUSES . . . [.]"

On January 6, 2021, the defendant came to the U.S. Capitol grounds wearing a cowboy hat, respirator painter's mask, a military-style backpack, and carrying American and Trump 2020 flags attached to a flagpole. The flagpole was a long metal pipe with a silver ball flagpole topper. At approximately 3:11 p.m. the defendant texted his girlfriend, "Hunny im up on capital steps[.]" The defendant sent another text message that went through at 7:25 p.m., which read, "I'm here knocking down fencing-to gain entry to the capital bldg."

At approximately 3:42 p.m. the defendant approached a line of police officers on the Upper West Terrace and challenged the officers with provoking hand gestures. Gov. Exhs. 200, 201, 207. The defendant then used the bottom portion of his flagpole to swiftly strike in the direction of an officer on the line. Gov. Exhs. 200, 201, 202, 207. In response to that attack, an officer deployed chemical irritants at the defendant. Gov. Exhs. 200, 201, 202, 207. Simultaneously, another rioter approached the police line near the defendant and police officers pushed the other rioter away.

Gov. Exhs. 200, 201, 202, 207. While the officers' attention was directed at the other rioter, the defendant raised his flagpole to strike the distracted officers. Gov. Exhs. 200, 201, 202, 207.

Officer Samuel Mott quickly intervened and moved towards the defendant and extended his police baton at port arms—that is, diagonally in front of him—towards the defendant. Gov. Exhs. 200, 207. The defendant swung the flagpole at Officer Mott striking him near his left hand and wrist and on the helmet. Gov. Exhs. 200, 207, 307. This is the assault charged in Count Three of the indictment. An officer continued to deploy chemical irritants at the defendant while another officer fired a 40mm non-lethal direct impact round at the defendant. Gov. Exhs. 200, 201, 202, 207, 307, 313. After the direct impact round was fired and a stream of chemical irritants was sprayed directly into the defendant's respirator mask, the defendant took one to two more swings towards the police line with the metal flagpole before retreating into the crowd. Gov. Exhs. 200, 201, 202, 207, 307, 313.

The evidence at trial will show that Officer Mott had pain and a burning sensation in his wrist immediately after Harrington attacked him. Officer Mott's pain continued for many months during which time he had difficulty bending his wrist and holding certain objects. Officer Mott treated his injury at home with rest, ice, and over-the-counter anti-inflammatory medication and a wrist brace. Around August 2022, after his symptoms did not improve, Officer Mott sought medical care for the ongoing pain to his wrist. In November 2022, he was referred to an orthopedic specialist, and in January 2023, he received an MRI in an effort to diagnose the injury. In January 2024, he received surgery to repair the injury to his wrist. In May 2024, he received a second surgery to his wrist.

Approximately 5 minutes after the attack with the flagpole, at about 3:47 p.m., the defendant and other rioters lifted a large, flat, opaque piece of material in front of the police line

and walked with it held up in front of the officers, thereby blocking the officers' view and impeding their ability to defend from the advancing crowd. Gov. Exhs. 200, 202, 204, 208. As the officers pushed back the crowd, the piece of material was knocked down and the defendant grabbed at an officer's baton. Gov. Exhs. 200, 208.

After police from Montgomery County, Maryland, reinforced members of the Metropolitan Police Department (MPD) and U.S. Capitol Police (USCP) and began to clear the Upper West Terrace, Harrington continued to resist. The defendant sat on the short row of steps in front of the police line as the officers began to move closer to the crowd and forcibly pressed his back into the officers. Gov. Exh. 309. Eventually, Harrington and the rioters were ushered away from the Capitol building. At approximately 4:55 p.m., Harrington and other rioters were ushered by police down the larger set of stairs from the Upper West Terrace to the West Plaza. Gov. Exh. 308. Harrington stayed for at least another 50 minutes when he was eventually escorted off the grounds after dark at approximately 5:48 p.m. Gov. Exh. 205, 206, 311, 314.

Later during the evening of January 6, the defendant sent a text message to an associate, describing the scene and what he was trying to accomplish. He wrote, "it was such a chaotic war going on and trying to claim the capital that there was a lot of casualty I got beat up pretty good[.]" He continued, "Fuck the DC police," and, "They flash bang us with teargas up the fucking Wazzu it was brutal it was a police called in from five different states to come in[.]" Despite describing the scene like a war zone and relaying that he had been injured, he was still willing to continue. He wrote, "I'm staying here for a couple days I'm gonna figure out what we're gonna do about this new setting Dictator we're about to fuck and get[.]" He continued, "The DEMORATS SPECIAL POLICE BUT IM GOING BACK FOR MORE TOMORROW THUS IS A STEAL[.]"

Even with time for reflection, Harrington expressed no remorse when texting about the events at the Capitol. On January 8, 2021, he wrote, "We caused the riot because the government devils dont get it[.]" On May 11, 2021, he admitted that he knew what he did on January 6 was wrong when he texted: "I WENT AND GOT MYSELF IN TROUBLE 6 January[.]" On July 28, 2021, however he implied his actions were justified when he wrote, "They are really pushing to prosecute all of us who PROTESTED 6 Jan" and "I want them all in prison starting from VP pence down to mitch McConnel[.]"

Starting in late 2021, the defendant began operating a social media account through the "GETTR" website. On October 6, 2021, he explained some of the reasons he participated in January 6 in the below post including acknowledging the role of Vice President Pence in the official proceeding (Gov. Exh. 602):



## PROCEDURAL HISTORY

Based on his actions, the grand jury returned an eight-count indictment on August 30, 2023, charging Harrington with Count One, Civil Disorder, in violation of 18 U.S.C. § 231(a)(3); Count Two, Obstruction of an Official Proceeding and Aiding and Abetting, in violation of 18 U.S.C. §

1512(c)(2) and 2; Count Three, Assaulting, Resisting, or Impeding Certain Officers, in violation of 18 U.S.C. §§ 111(a)( 1) and (b); Count Four, Entering and Remaining in a Restricted Building or Grounds with a Deadly or Dangerous Weapon, in violation of 18 U.S.C. § 1752(a)(1) and (b)(1)(A); Count Five, Disorderly and Disruptive Conduct in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(2) and (b)(1)(A); Count Six, Engaging in Physical Violence in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(4) and (b)(1)(A); Count Seven, Disorderly Conduct in a Capitol Building or Grounds in violation of 40 U.S.C. § 5104(e)(2)(D); Count Eight, Act of Physical Violence in a Capitol Building or Grounds, in violation of 40 U.S.C. § 5104(e)(2)(F). ECF 12. The Court granted the government's motion to dismiss Count Two. ECF 34 and Minute Order July 10, 2024.

## TRIAL PROCEDURE

A bench trial on the remaining seven counts is scheduled to begin on July 29, 2024. On April 24, 2024 the defendant filed a waiver of jury trial. ECF 19.

For efficiency, the parties reached factual stipulations regarding the Capitol building and grounds, the certification of the Electoral College vote, official duties of Capitol Police and MPD assistance to Capitol Police, the impact of the riot on Federally Protected Functions, and the identity of the defendant. The parties have stipulated to the authenticity of MPD body worn camera footage, messages from the defendant's iCloud account, and the posts on the defendant's GETTR account.

The parties have stipulated to the testimony of one trial witness, U.S. Secret Service Inspector Lanelle Hawa, incorporating transcripts of her prior testimony and the referenced exhibits in an earlier January 6 trial, which in this case are government exhibits 801 and 801A–D. Inspector Hawa, the Liaison to the Capitol for the U.S. Secret Service, testified about her security

preparations in anticipation of the Certification proceeding and how the breach of the Capitol came to pose a severe threat to the safety of Vice President Pence and his wife and daughter, who were also Secret Service protectees that day. Gov. Exh. 801.

At trial, the government expects to call USCP Lieutenant Frederick Hopkins, MPD Officer Anthony Campanale, Former MPD Officer Samuel Mott, MPD Officer Matthew Fleming, Montgomery County Maryland Police Officer James Brewer, and FBI Special Agent William Whitfield.

The government has met and conferred with defense counsel about the exhibits it plans to offer into evidence. The government has provided a copy of the exhibits and its proposed exhibit list. The parties have also met and reviewed the list and exhibits in an effort to reduce relevance-based objections at trial.

As directed by the Court at the pretrial conference on June 27, 2024, the parties submitted a joint filing of the elements of the charged offenses with the defendant's objections noted underneath the government's proposed instructions in highlighted text. ECF 38.

## ANTICIPATED ISSUES AT TRIAL

Based on a review of the evidence and discussion with counsel, the government anticipates the following issues may be relevant to the Court's verdict.

### A. Whether the flagpole employed by Harrington to attack MPD Officers constitutes a deadly and dangerous weapon

The government's proposed jury instructions define an object as a "deadly or dangerous weapon" in one of two ways. First, an object is a deadly or dangerous weapon if it is inherently or obviously dangerous or deadly. Such inherently dangerous weapons include guns, knives, and the like. The second definition is the focus of this case. An object is a deadly or dangerous weapon if the object is *capable* of causing serious bodily injury or death to another person and the defendant

*used* it in that manner. *United States v. Arrington*, 309 F.3d 40, 44 (D.C. Cir. 2002) ("For an object that is not inherently deadly . . . the following additional element is required: (4) the object must be capable of causing serious bodily injury or death to another person *and* the defendant must use it in that manner."). In *United States v. Easterday*, this Court rejected a narrower interpretation of deadly and dangerous weapon that would require more than mere capability or possibility of harm, but rather a significant risk of harm. 2024 WL 1513527 at 12 (D.D.C. April 8, 2024). Other courts agree that almost anything can be a deadly or dangerous weapon if used in a violent fashion. *See, e.g.*, *United States v. Sanchez*, 914 F.2d 1355, 1359 (9th Cir. 1990) (citing cases involving "mop handle" and "mouth and teeth"); *Loman*, 551 F.2d at 169 (citing cases involving "a wine bottle," "shoes," "a rake," and "a chair leg").

An object does not lose its capacity to cause harm in the manner of its use, and therefore cease to be a dangerous weapon, when it is used to attack a victim wearing protective gear. When interpreting Section 111(b), courts have focused on the defendant's use of the object, not on its impact or effect on the victim; "the object's latent capability . . . coupled with the manner of its use, is determinative." *United States v. Loman*, 551 F.2d 164, 169 (7th Cir. 1977) (citation omitted) (walking stick that broke during assault was a dangerous weapon despite no serious injury). It makes sense to focus on the defendant's actions and the object itself when determining whether an object is capable of causing serious bodily injury or death especially since assault on a federal officer is a general intent crime. *See United States v. Feola,* 420 U.S. 671, 686 (1975) ("We hold, therefore, that in order to incur criminal liability under § 111 an actor must entertain merely the criminal intent to do the acts therein specified."); *accord United States v. Kleinbart*, 27 F.3d 586 (D.C. Cir. 1994); *United States v. Duran*, 884 F. Supp. 566, 568 (D.D.C. March 19, 1995) (concluding that "assault on a federal officer is a general intent crime."). That is, to be found guilty

under § 111, a defendant need only intend to assault, resist, oppose, impede, intimidate or interfere with the victim, not to injure or harm the victim—no matter whether the victim might be particularly vulnerable or particularly well-suited to defend himself from any resulting harm.

In *United States v. Mark Waynick*, Judge Kelly refused to consider the protective gear of the officers in determining whether a flagpole was used in a manner capable of causing serious bodily injury or death stating, "I don't think I take into account what the officers were wearing . . . I think there's plenty of instances where even officers wearing full riot gear, defendants are convicted of assaulting them with a dangerous weapon even with full riot gear on." 23-cr-175 (TJK) Tr. Transcript April 17, 2024 at 21. This holding makes good sense: shifting focus from the defendant's actions to the victim's relative preparedness would lead to absurd results and undercuts the purpose of Section 111. Surely, firing a gun at an officer who is visibly donning a bullet-proof vest would not mitigate the inherent dangerousness of the gun. The same should hold for non-inherently dangerous and deadly objects that are used as weapons. Likewise, police officers should be encouraged to wear protective gear as part of their job, especially when responding to large-scale riots with multiple violent offenders. Adopting an approach that considers law enforcement officers' protective gear when determining a blunt instrument's capacity to harm them would eviscerate Section 111 since police almost always wear some level of protective gear while on duty. That approach would be inconsistent with Congress' reasons for enacting § 111: protecting federal officials and deterring interference with their law enforcement activities. *See Arrington*, 309 F.3d at 46 ("As the Supreme Court noted in *Feola,* Congress intended § 111 to protect federal officers to the maximum extent possible[.]" (citation omitted)); *United States v. Walker*, 835 F.2d 983, 987 (2d Cir. 1987) (§ 111 enacted to protect federal officers and federal functions); *United*

*States v. Beckner*, 983 F.2d 1380, 1385 (6th Cir. 1993) (same); *United States v. Jim*, 865 F.2d 211, 214 (9th Cir. 1989) (same).

In this case, the evidence will show that the defendant forcibly swung his metal flagpole at officers on the police line, including Officer Samuel Mott. Officer Mott defended other officers and himself from the attack by extending his police baton at port arms towards the defendant. While the defendant swung the pole at Officer Mott, he struck Officer Mott's baton near his left hand and wrist and he hit Officer Mott on the helmet. When the defendant's metal pole struck Officer Mott's baton, it made an audible sound. And when the defendant's metal pole struck Officer Mott's helmet, it again made an audible sound. This sound further demonstrates the flagpole's dangerous capacity for inflicting harm—and the fact that it hit Officer Mott's helmet, rather than his bare head, likely prevented catastrophic injury to the officer. That Officer Mott tried to repel the attack, defended himself with his tactical training, or used protective equipment, should have no bearing on the question of whether the defendant used his metal pole in a manner that was capable of causing serious bodily injury.

### B. Whether Harrington "inflicted" bodily injury upon Officer Samuel Mott

Harrington did in fact inflict bodily injury upon Officer Samuel Mott by attacking him with the metal flagpole. The term "bodily injury" means an injury that is painful and obvious, or an injury for which medical attention ordinarily would be sought. Bodily injury includes a cut, abrasion, bruise, burn or disfigurement; physical pain; illness; impairment of the function of a bodily member, organ, or mental faculty; or any other injury to the body, no matter how temporary. *Easterday*, 2024 WL 1513527, at *8 (finding "no reason to depart from" the "sensible course" of the many circuits that have defined "bodily injury" to "include[] 'physical pain' without any temporal requirement, as well as "any other injury to the body, no matter how temporary"); Fifth

10

Circuit Model Jury Instruction No. 2.07; Tenth Circuit Model Jury Instruction No. 2.09; 18 U.S.C. § 1365(g)(4); *see also United States v. McAbee*, 21-cr-35 (RC) (ECF 376, at 20)).

The defendant can be found guilty under § 111(b) for inflicting bodily injury to Officer Mott whether the injury was caused by the flagpole striking the officer's wrist directly or by the officer's movement in defending himself against Harrington's attack. In relevant part, § 111(b) provides that "whoever, in the commission of any acts described in [Section 111(a)] . . . inflicts bodily injury, shall be fined under this title or imprisoned not more than 20 years, or both."

In *United States v. Garcia-Camacho*, the Ninth Circuit concluded that "to inflict" under Section 111(b) means "to cause." 122 F.3d 1265, 1269 (9th Cir. 1997). In *Garcia-Camacho*, the defendant lunged at an agent and struggled with him as the agent attempted to place the defendant under arrest. During the struggle, the agent fell, badly breaking his ankle. Affirming the defendant's Section 111(b) conviction, the court of appeals cited Webster's Third New International Dictionary (1976) and its definition of "inflict": "to lay a blow on; to cause something damaging or painful to be endured." *Id*. (cleaned up).[1] Although the victim agent could not testify that Garcia-Camacho struck his ankle, the court of appeals noted that the injury occurred while the agent and the defendant were in "close locked combat" and the fact that Garcia-Camacho "did not kick the Agent's ankle or otherwise come into contact with it does not demonstrate that his

---

[1] Because Section 111(b) does not provide a definition of inflict, the opinion in *Garcia-Camacho* correctly examined its ordinary meaning. *See United States v. Robertson*, No. 22-3062 ---F.4th---, 2023 WL 6932346 at *6 (D.C. Cir. Oct. 20, 2023) (because Congress had not defined "corruptly" in 18 U.S.C. § 1512, court must look to the word's ordinary meaning). *Cf. Fischer v. United States*, 144 S. Ct. 2176, 2188 (2024) (comparing the undefined word "corruptly" to the word "wrongful"). Here, this Court should also apply the ordinary meaning of the word "inflict."

A substantially similar definition to that used in *Garcia-Camacho* can still be found in Merriam-Webster's online dictionary. *See* "Inflict Definition and Meaning," MERRIAM-WEBSTER.COM, https://www.merriam-webster.com/dictionary/inflict (last checked July 9, 2024) ("to give by or as if by striking" or "to cause (something unpleasant) to be endured").

11

behavior was not the cause of the injury." *Id.* The court of appeals concluded that on these facts, Garcia-Camacho did directly cause the agent's injury. *Id.*; *see also United States v. Willix*, 723 Fed.Appx. 908, 912 (11th Cir. 2018) (declining to recognize distinction between "inflict" and "mere proximate cause" and affirming conviction under Section 111(b) where district court did not define "inflict" in jury instruction and rejected the defendant's proposed instruction defining "inflict" more narrowly than "cause").

Moreover, a defendant need not intend to inflict injury in order to be found guilty. For example, *United States v. Jackson* involved a defendant who fled from United States Marshals and resisted arrest. 310 F.3d 554 (7th Cir. 2002). Marshals tackled Jackson, who squirmed. An officer trying to handcuff Jackson tore a ligament in his thumb. After Jackson's jury trial, the Seventh Circuit found the evidence against Jackson was sufficient to convict, because the government did not need to prove Jackson's intent to cause bodily injury to an officer under Section 111(b). *Id.* at 556–57. The Seventh Circuit also rejected Jackson's claim that he did not "inflict" injury, stating:

> Likewise Jackson inflicted Scott's injury no matter what was in Jackson's mind. Doubtless "inflict" is more restrictive than "cause"; if Jackson had not resisted, but Scott had tripped on his untied shoelaces while walking over to apply handcuffs, it would not make sense to say that Jackson had "inflicted" an injury. But the actual injury occurred while Scott was grappling with Jackson, who applied force directly to Scott's person. This satisfies the normal understanding of "inflict."

*Id*. at 557.

In *United States v. Zabawa*, the Sixth Circuit went further and held that "inflict" required that the defendant be the "direct physical cause" of the injury. 719 F.3d 555, 561 (6th Cir. 2013) (reversing the defendant's conviction under Section 111(b)). In *Zabawa*, which involved a physical confrontation between an inmate and corrections officers, the victim officer discovered a cut above his eye after a protracted struggle with the defendant, and he could not say when or how it occurred, or even whether it might have been the victim officer himself who caused the injury by headbutting

12

the defendant. *Id*. The Court held that "[i]nflict means something more precise—and thus something narrower—than merely '[t]o be the cause of or reason for; result in.' What inflict conveys is a sense of physical immediacy: to cause harm directly, by physical force." *Id.* at 560.[2]

The evidence at trial in this case will show that Officer Mott suffered an injury to his wrist while in "close locked combat" with the defendant and that the defendant's flagpole struck Officer Mott on his baton, and on or near the hand that sustained the wrist injury. Even if Officer Mott is not able to testify whether the flagpole itself specifically struck his wrist, the evidence will nevertheless show that the defendant inflicted the injury and was the direct physical cause of the officer's pain. The pain to Officer Mott's wrist occurred only after the defendant struck him with a metal flagpole. The pain was directly caused by the defendant swinging the flagpole and striking Officer Mott, whether or not the defendant's metal pole made direct contact with the officer's wrist or otherwise caused Officer Mott's wrist to be contorted.

Unlike in *Zabawa*, Officer Mott will attribute his injury directly to the blow from the defendant's flagpole that hit his baton or hand near his left wrist. Thus, even under *Zabawa*'s demanding standard—and certainly under the definitions in *Garcia-Camacho* and *Jackson*, the

---

[2] In *United States v. Ryan Samsel et. al*, a January 6 bench trial, Judge Cobb defined "inflict" in her legal instructions as follows:

> [T]o inflict an injury is to directly cause that injury through the application of physical force. *See United States v. Jackson*, 310 F.3d 554, 557 (7th Cir. 2002) ("'inflict' is more restrictive than 'cause,' and connotes an injury directly caused by the defendant's application of force to an officer, rather than merely as a result of the defendant's conduct"); *see also United States v. Zabawa*, 719 F.3d 555, 560 (6th Cir. 2013) ("'inflict' refers to physical, not proximate, causation," such that "[t]he person whose action was the direct physical cause of [the injury] . . . is the person who inflicted it for purposes of § 111(b)"); *Gray v. United States*, 980 F.3d 264, 267 (2d Cir. 2020) (same, quoting *Zabawa*).

21-cr-537 (JMC) ECF 313, at 11 (reproduced in Minute Order of Nov. 2, 2023).

evidence in this case will support a finding that the defendant "inflicted" bodily injury on Officer Mott. The uncertainty in *Zabawa* is not present here. Officer Mott immediately felt pain in his wrist after the defendant struck him with the metal flagpole. That pain continued for many months and impaired the function of his wrist, and ultimately led to Officer Mott seeking medical treatment. The evidence will show that the defendant is guilty of Section 111(b) because he inflicted bodily injury in the commission of his assault.

## CONCLUSION

The government respectfully submits this summary of the evidence and issues to be presented at trial.

Dated: July 25, 2024

                                        Respectfully Submitted,

                                        MATTHEW M. GRAVES
                                        United States Attorney

By:    */s/ Kyle R. Mirabelli*

                                        KYLE R. MIRABELLI
                                        N.Y. Bar No. 5663166
                                        CARLOS A. VALDIVIA
                                        D.C. Bar No. 1019242
                                        Assistant United States Attorneys
                                        601 D Street, N.W.
                                        Washington, D.C. 20579