**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 23-cr-298 (JEB)** |
| **DOUGLAS HARRINGTON,** | |
| **Defendant.** | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Douglas Harrington to 96 months incarceration, the maximum term of incarceration under Count Three of the indictment and a 12-month downward variance from the government's calculated Sentencing Guidelines range. The government also recommends that the Court impose 36 months of supervised release, $2000 in restitution to the Architect of the Capitol and restitution in an amount to be determined by the Court to former Metropolitan Police Department (MPD) Officer Samuel Mott, and the mandatory assessment of $100 for each of the two felony convictions, plus $25 for each of the three class A misdemeanor convictions and $10 for each the two class B misdemeanor convictions, for a total assessment of $295.

## I.    INTRODUCTION

The defendant, Douglas Harrington, violently participated in the January 6, 2021 riot at the United States Capitol that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers—including Officer Samuel Mott, who Harrington struck

with a flagpole—and resulted in more than 2.9 million dollars in losses.[1]

Harrington, a former member of the Navy, entered and remained for hours on the United States Capitol grounds as part of the riotous mob. He did so despite the violence and chaos all around him and being separated from his girlfriend on the West Front. Harrington planned for violence and brought a respirator mask with him to withstand chemical irritants. He joined the mob, climbed to the Upper West Terrace, and attacked police officers who blocked his advance on the building. Harrington then joined other rioters in pushing a large piece of material against a police line, tried to disarm an officer of his police baton, and resisted officers' efforts to clear the Upper West Terrace of rioters.   Harrington did not leave the Capitol grounds until he was physically ushered away by police at approximately 5:48 p.m.

## II.    FACTUAL BACKGROUND

### A.    The January 6, 2021 Attack on the Capitol

The government refers the Court to the Statement of Facts filed in this case, ECF 1, for a short summary of the January 6, 2021 attack on the United States Capitol by hundreds of rioters who tried to disrupt the peaceful transfer of power after the November 3, 2020 presidential election.

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9 million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

### B.    Harrington's Role in the January 6, 2021 Attack on the Capitol

### *Pre-January 6 Conduct*

In the days and weeks following the 2020 presidential election, Harrington sent a cascade of messages decrying the outcome. Government Exhibits 507 and 508 were admitted at trial and contain the following text messages from Harrington.

- On November 6, 2020, he wrote, "Im praying for what zGod[2] wants me to do in helping out Trump against the demoRATS in Georgia and Pennsylvania[.]" Gov. Ex. 507 at 1.

- On November 7, Harrington expressed a desire to prevent the peaceful transfer of power when he wrote that he "would love to get a battalion of warriors and block the white house from them defiling the peoples house . . . [.]" *Id.*

- On November 8, 2020, he wrote, "We are seeing satin cheeting and we have no power to do anything other than start calling tbe Republican senators and rep to have them start protesting the fake stealing of our votes." *Id.*

- In a flurry of messages on November 17, 2020, Harrington wrote, "Im waiting for the courts to finish before I get involved" while at the same time expressing that his involvement would include "Kicking down punks and crippling them hurting them so they know who's street it belongs too ITS WE THE PEOPLE THE TAXPAYERS[.]" *Id.*

- Harrington stated that, "If Supreme Court don't rectify the EVIL that's prayer time ad what God wants his warriors to do next." *Id.*

- On November 21, 2020, he wrote, "nothing short other than real war . . .will come jan5[.]" *Id.*

Harrington sent an email to the East Idaho Proud Boys on December 7, 2020 stating that he wanted to join them for their December 12, 2020 march in Washington D.C. Gov. Ex. 503. Harrington attended the Million MAGA March in Washington D.C. on December 12, 2020. Image 1, below, was published on Shuttershock[3] with the caption "A supporter of US President Donald

---

[2]  Misspellings and typos are left uncorrected in quoted messages.

[3]  "Shutterstock, Inc. is an American provider of stock photography, stock footage, stock music, and editing tools." See https://en.wikipedia.org/wiki/Shutterstock (visited Nov. 15, 2024).

J. Trump rides a scooter near the White House in Washington, DC, USA, 11 December 2020. Supporters of US President Donald J. Trump are in town to participate in the second 'Million MAGA March' on 12 December to protest the results of the 2020 Presidential election."[4]



*Image 1: December 11, 2020 photograph of Harrington near the White House*

On December 13, 2020, Harrington texted that he "kick[ed] some f***ing ass [at the rally] beat f***ing heads in and has a few teeth knocked out on the little bitches called antifa I f*** it had so much fun kicking f***ing guts anyways that's what Warriors do and Warriors plan to win for Trump . . . I'm going back out here January 20 if Biden tries to take the White House[.]" Gov. Ex. 508 at 1. Harrington texted about his disappointment in the outcome of the election and his hopes that the results might be overturned, then added, "I don't know we'll have to pray about it but there might be blood come starting January 20 and then comes the snipers and start taking out the enemy[.]" *Id.* at 3.

During the conversation, Harrington's associate wrote, "You fought along side the Proud Boys!!!" *Id.* at 1. Harrington responded, "Yeah I'm one of the problems now they recruited me when I saw that I took my yard chain out and f***ing whoop . . . antifa right in the f***ing helmet and then drug a man . . . and put them on the ground and start beating the f*** out of them they

---

[4] https://www.shutterstock.com/editorial/image-editorial/11538982b

said goddamn oh man you're a f***er warrior I said I'm a f***ing marine they hired me on the spot it says come join us brother[.]" *Id.* Harrington continued stating "They . . . signed me up with the Idaho power boys[.]" *Id.* His associate expressed interest in joining as well and Harrington responded describing the Proud Boys as "a good organization or honorable . . . and there's not a f***ing liberal allowed in that organization." *Id.* at 2. Harrington continued discussing his plans to open his own chapter and start recruiting members in Wyoming since he anticipated "a war[.]" *Id.* While discussing preparations and attempts to join the Proud Boys with his associate, Harrington wrote minutes later, "since we got the government is watching everything at this point don't discuss weapons or anything in planning online." *Id.* at 5.

After the Million MAGA March in December, Harrington left Washington D.C. and continued texting about his participation in, and anticipation of, political violence.

- On December 19, 2020, Harrington wrote, "They dont even know how they are stoking 1776 Boston Tea pary[.]" Gov. Ex. 507 at 2.

- On December 19, 2020, Harrington texted, "You kniw i was in DC for a week and at the rallies ladt week . . . I helped the proud boys kick ass[.]" Gov. Ex. 508 at 7.

- On December 19, 2020, after his associate told Harrington that he wasn't going to join the Proud Boys or participate in January 6, 2021, Harrington responded, "It's not for you then im going out to DC to fight for our country's integrity if biden gets in we have but allowed satin free pass to lie cheet steal . . . 6 JANUARY 2021 IS THE DAY WE MARCH ON WASHINGTON DC THE WHOLE REASON FOR FREEDOM IS SOMEONES BLOOD PAYS THE PRICE[.]" Gov. Ex. 507 at 3.

- On December 20, 2020, as his girlfriend pled with him to spend time with his family "Instead of being on Instagram an planning trips to Washington DC" Harrington responded "our country needs ne more to fight for you and [our son]." He continued, "If i die you have a will draw up before i leave But its nit a JOKE ANYMORE[.]" *Id.* at 4.

- On December 21, 2020, Harrington wrote, "Im going to Washington DC for rally again to save our VOTES ON 6 JANUARY 2021 . . . Its to show our support against the STEAL OF OUR VOTES." *Id.*

- Later in the same conversation, he wrote, "Pray for my journey TO THOS RALLY because there are a lot of powerful people that don't want President HE IS GODS CHOSEN ONE

TO LEAD THE BATTLE JUST LIKE HOD GAVE THE JEWS KING DAVID HE HAS GIVEN US A BILLIONAIRE THAT GAVR UP ALL TO SERVE THE WORLD AGAINST SATAN[.]" *Id.*

- On December 22, 2020, he wrote, "I TOOK AN OATH TO PROTECT THE CONSTITITON FROM ENEMIES FOREIGN AND DOMESTIC THAT DAY IS HERE ON THE LAND OF THE USA THE ENEMY IS THE UNITED STATES CONGRESS BOTH HOUSES ALONG WITH THE SENATE AND TO THE DISGRACE SCOTUS[.]" *Id.*

- On December 22, 2020, he wrote, "THESE COMMIES NEED TO PAY FOR THEIR HIGH CRUMES AND TREASONOUS ATTEMPTED COUP[.]" *Id.*

- On December 31, 2020, he explicitly wrote about his plans for violence when he texted "We're planning to f*** up antfa and blm thus time we want blood these pussies are f***ing criminal [.]" *Id.* at 5.

- In response to a "Happy new year" text on January 1, 2021, Harrington stated, "Getting my warriors gear ready . . . Happy New year is our President TRUMP STILL IN OFFICE AFTER 20 JAN[.]" *Id.*

- On January 4, 2021, an associate texted Harrington "F*** the arrested Enrique Tarrio!" Harrington responded, "Yes we got funds for his defense[.]" *Id.*

### *Harrington's Involvement in the January 5, 2021 Protest*

On January 5, 2021, Harrington traveled to Washington D.C. with his family. Trial Tr. 7/30/2024 45:3 and PSR ¶ 101. He attended the Rally to Revival at Freedom Plaza that day. Below is a still image of Harrington at Freedom Plaza on January 5 from Government Exhibit 301. It shows Harrington carrying the same flagpole he carried to the Capitol on January 6, 2021 with the same large American and "Trump 2020" flags attached.



*Government Exhibit 301 at approx. 22:05: Harrington marching during January 5, 2021 protest.*

### *January 6, 2021, Harrington's Approach to the Capitol*

On January 6, 2021, Harrington went to the Stop the Steal rally at the Ellipse with his then-fourteen-year-old son and girlfriend. Trial Tr. 7/29/2024 at 208:15-16. Harrington testified at trial that he wanted the trip to be a "vacation" for the family. *Id.* at 208:22. After the speech at the Ellipse, Harrington planned to go to the Capitol, but his girlfriend was concerned that it might "get rough[.]" Trial Tr. 7/30/2024 at 45:3-4. Because Harrington and his girlfriend knew it might get violent at the Capitol, they left their son at the hotel room "for the whole day." *Id.* at 45:1-18.

Harrington walked from the Stop the Steal rally to the West Front of the U.S. Capitol wearing a cowboy hat and a military-style backpack and carrying the flagpole with two flags attached. Harrington passed through the area of the Peace Circle which had been heavily barricaded with fencing, bike-racks and "Area Closed signs." Gov. Ex. 302.

Harrington moved through the crowd on the West front toward the Capitol. At trial, Harrington testified that he and his girlfriend traveled to the Capitol grounds but became "separated by the tear gas and the rubber bullets upon arriving at the Capitol grounds." Trial Tr. 7/30/2024, at 45:11-12.   Clearly, Harrington knew that the police were working to prevent rioters from advancing closer, but he nevertheless continued on.



*Government Exhibit 312 at 13 seconds: Harrington (red circle) moving through crowd on the West front with girlfriend (yellow circle) following behind him.*

By around 3:11 p.m., Harrington made his way through the crowd and ascended to the inaugural stage seating area. From there he sent a text to his girlfriend, "Hunny im up on capital steps." Gov. Ex. 507 at 5. At one point, Harrington sent another text message which read, "I'm here knocking down fencing-to gain entry to the capital bldg." *Id.*



*Government Exhibit 306 at 00:43: Harrington using mobile telephone on Inaugural stage.*

### *Attacks on Police Line*

At the Upper West Terrace, where police were engaged in a violent struggle with the crowd and using crowd control measures, Harrington put on his painter's respirator mask and goggles. At approximately 3:42 p.m., Harrington approached a line of police officers on the Upper West Terrace and challenged the officers with provoking hand gestures. Gov. Ex. 200, 201, 207, 802. When asked at trial "what message [he was] trying to send with that gesture" Harrington stated, "Well, if they wanted to pick on someone, I'm more than capable to defend myself[.]" Trial Tr. 7/30/2024 at 17:14-14 (*See also Id.* at 61:16-20 "The hand gesture was, I believe I said, to pick on someone their own size.")



*Government Exhibit 802: Harrington in front of police line with hand gesturing towards officers.*



*Government Exhibit 200 at approximately 2:24: Harrington gesturing toward Officer Mott.*

Harrington then used the bottom portion of his flagpole to swiftly strike in the direction of an officer on the line. Gov. Ex. 200, 201, 202, 207.



*Government Exhibit 201 at approx. 1:25: Harrington swinging flagpole toward police line.*

In response to that attack, an officer deployed chemical irritants at Harrington. Gov. Ex. 200, 201, 202, 207.



*Government Exhibit 200 at 2:41: Harrington (red circle) swinging flagpole toward police line while Officer deploys pepper-spray (yellow circle).*

Simultaneously, another rioter approached the police line near Harrington and police officers pushed the other rioter away. Gov. Ex. 200, 201, 202, 207. While the officers' attention

was directed at the other rioter, Harrington raised his flagpole to strike the distracted officers. Gov.

Ex. 200, 201, 202, 207.



*Government Exhibit 200 at 2:36: Harrington raising flagpole again toward police line.*

MPD Officer Samuel Mott quickly intervened. He extended his police baton at port arms—

that is, diagonally in front of him—towards Harrington. Gov. Ex. 200, 207. Harrington swung the

flagpole from left to right at Officer Mott, striking him near his left hand and wrist and on the

helmet. Gov. Ex. 200, 207, 307.



*Government Exhibit 207 at 00:19: Harrington swinging the flagpole toward Officer Mott.*



*Government Exhibit 207 at 00:19: Harrington striking downward on top of Officer Mott's hand and wrist.*



*Government Exhibit 207 at 00:19: Harrington striking Mott near the hand and helmet.*

Within a second of Harrington striking downward on top of Officer Mott's baton, near Mott's left hand, Officer Mott braced himself and rotated his baton in defense of Harrington's attack. He then used the baton to push the flagpole away.



*Government Exhibit 207: Officer Mott rotating his hand, wrist, and forearm (yellow circle) from a supinated position to a pronated position to defend himself against Harrington's attack.*

Another officer continued to deploy chemical irritants at Harrington, while yet a third

officer, fired a 40-millimeter non-lethal direct impact round at him. Gov. Ex. 200, 201, 202, 207, 307, 313. Even after the direct impact round was fired and a stream of chemical irritants was sprayed directly into Harrington's respirator mask, Harrington took one to two more swings towards the police line with the flagpole before retreating into the crowd. Gov. Ex. 200, 201, 202, 207, 307, 313.



*Government Exhibit 313 at 00:01: Harrington (red circle) making a few swings at the police line while being sprayed (yellow arrow) just before retreating into crowd.*

At about 3:47 p.m., approximately five minutes after Harrington's attack on Officer Mott, he and other rioters lifted a large, flat, opaque piece of material in front of the police line and advanced on the police line.[5] The rioters used the opaque material to push into the police line.

---

[5] During this attack on the police line, another rioter held a white pole with a large black object attached to it upright and walked toward the police line. Gov. Ex. 200 at 7:49. The rioter did not swing the pole toward the police line, but rather walked with it held upright into the police line. Officer Mott raised his baton in response and the pole made contact with Officer Mott's baton near his left hand. *Id.* The defense raised this moment as a possible cause of the injury to Officer Mott's wrist, but that incident did not involve a forcible strike, nor did it cause a forceful rotation of Officer Mott's forearm and wrist.

Gov. Ex. 200, 202, 204, 208. As the officers pushed back against the rioters, they knocked the opaque material to the ground.  Harrington then grabbed and pulled on an officer's baton. Gov. Ex. 200, 208. It appears he also tried to grab an officer's utility belt and pushed against a police riot shield with both of his hands. Gov. Ex. 204 and 208.



*Government Exhibit 204 at 6:19: Harrington pushing material into police line.*



*Government Exhibit 208 at 2:29: Harrington pulling on a police baton.*



*Government Exhibit 204 at 6:25 Harrington reaching for an officer's tool belt and baton.*



*Government Exhibit 208 at 2:34: Harrington pushing against police riot shield.*

Police officers from Montgomery County, Maryland arrived at the Capitol to reinforce MPD and U.S. Capitol Police (USCP) officers and began to clear the Upper West Terrace. Harrington continued to resist. At approximately 4:22 p.m., he sat on the short row of steps in front of the police line and forcibly pressed his back into the officers on the line. Gov. Ex. 309. Eventually, the officers pushed Harrington and the other rioters away from the Capitol building.

At approximately 4:55 p.m., the officers ushered Harrington and other rioters down the exterior stairs from the Upper West Terrace to the West Plaza. Gov. Ex. 204 and 308. Harrington stayed on Capitol grounds for at least another 50 minutes when he was eventually escorted off the grounds after dark at approximately 5:48 p.m. Gov. Ex. 205, 206, 311, 314.



*Government Exhibit 311 at 00:10: Harrington being escorted off Capitol grounds by police at approximately 5:48 p.m.*

Despite staying on the Capitol grounds for hours, battling with police and trying to forcibly push through a police line, Harrington testified at trial that he was not trying to get into the Capitol building on January 6, 2021. Trial Tr. 7/30/2024 32:10-12. That testimony flew in the face of his text messages from January 6 that said he was "breaking down fencing to gain entry into the Capitol building" and that he was trying to "claim the capital[.]" *Id.* at 32:13 – 33:3 and Gov. Ex. 507 at 5-6.

### Harrington's Post-riot Statements

Later during the evening of January 6, Harrington sent a text message to an associate, describing the scene and what he was trying to accomplish. He wrote, "it was such a chaotic war

going on and *trying to claim the capital* that there was a lot of casualty I got beat up pretty good[.]" (emphasis added) Gov. Ex. 507 at 6. He continued, "F*** the DC police," and, "They flash bang us with teargas up the f***ing Wazzu it was brutal it was a police called in from five different states to come in it must've been a mild 3000 police to back up the marshals because Trump wouldn't let the Pentagon deploy National Guard[.]" *Id.*

Despite describing the scene like a war zone and relaying that he had been injured, he was still willing to continue. Harrington wrote, "I'm staying here for a couple days I'm gonna figure out what we're gonna do about this new setting Dictator we're about to f*** and get[.]" *Id.* He continued, "The DEMORATS SPECIAL POLICE BUT IM GOING BACK FOR MORE TOMORROW THUS IS A STEAL[.]" *Id.*

Even with time for reflection, Harrington expressed no remorse when texting about the events at the Capitol. On January 8, 2021, he wrote, "We caused the riot because the government devils dont get it[.]" *Id.* On January 11, 2021, he texted "We should have grabbed all of the traitors and waited for military tribunals[.]" *Id.* On January 14, 2021, he bragged about his violent conduct, writing, "We were pushng the police backwards." *Id.* On January 19, 2021, he criticized the potential for arrest and prosecution writing "The crime family biden is going to persecute us all soon." *Id.* On April 8, 2021 he criticized those who did not participate in January 6 asking "Did you stand with president Trump on 6 JANUARY 2021 I dont think so you all were too scared to die for freedom-and you don't deserve it." *Id.* On May 11, 2021, he bragged, "I WENT AND GOT MYSELF IN TROUBLE 6 January[.]" *Id.* at 7.  He was not expressing regret or remorse, as shown by his text on July 28, 2021, when he wrote, "They are really pushing to prosecute all of us who PROTESTED 6 Jan" and "I want them all in prison starting from VP pence down to mitch mcConnel[.]" *Id.*

Starting in late 2021, Harrington amplified his rejection of the notion that he had done anything wrong through his posts on a social media account through the "GETTR" website. On October 6, 2021, he stated he "marched peaceably…with flags" because he "knew VP Pence . . . [was] about to become [a] traitor . . . [.]" (Gov. Ex. 602):



In March, 2022, Harrington posted that he wanted the political violence to escalate to a "war with bullets" instead of "march[ing] with flags[.]" (Gov. Ex. 603):



Harrington was arrested in this case on August 9, 2023, and even after facing several felony

charges for his conduct on January 6, Harrington continued to advocate for political violence on GETTR. On January 10, 2024, Harrington reposted the below image on another GETTR account operated by him:



## III.    THE CHARGES AND CONVICTION

On August 30, 2023, a federal grand jury returned an indictment charging Harrington with eight counts:

- Count One, Obstructing, Impeding, or Interfering with Law Enforcement During a Civil Disorder, in violation of 18 U.S.C. § 231(a)(3);

- Count Two, Obstruction of an Official Proceeding and Aiding and Abetting, in violation of 18 U.S.C. §§ 1512(c)(2) and 2;

- Count Three, Assaulting, Resisting, or Impeding Certain Officers Using a Deadly or Dangerous Weapon or Inflicting Bodily Injury, in violation of 18 U.S.C. § 111(a)(1) and (b);

- Count Four, Entering and Remaining in a Restricted Building or Grounds with a Deadly and Dangerous Weapon, in violation of 18 U.S.C. § 1752(a)(1) and (b)(1)(A);

- Count Five, Disorderly and Disruptive Conduct in a Restricted Building or Grounds with a Deadly and Dangerous Weapon, in violation of 18 U.S.C. § 1752(a)(2) and (b)(1)(A);

- Count Six, Act of Physical Violence in a Restricted Building or Grounds with a Deadly and Dangerous Weapon, in violation of 18 U.S.C. § 1752(a)(4) and (b)(1)(A);

- Count Seven, Disorderly Conduct in Capitol Grounds, in violation of 40 U.S.C. § 5104(e)(2)(D); and

- Count Eight, Act of Physical Violence in Capitol Grounds, in violation of 40 U.S.C. § 5104(e)(2)(F).

Prior to trial, the Court granted the Government's motion to dismiss Count Two in light of the Supreme Court's intervening decision in *Fischer v. United States*, 144 S. Ct. 2176 (2024). ECF 34 and Minute Order July 10, 2024.

On, July 31, 2024, following a bench trial, this Court convicted Harrington of Counts One, Seven and Eight. The Court also found Harrington guilty of the lesser offense for Count Three, 18 U.S.C. § 111(a)(1), Assaulting, Resisting, or Impeding Certain Officers. It also convicted Harrington of the lesser-included offenses for each of the § 1752 offenses in Counts Four through Six. The Court found Harrington not guilty of the enhanced penalties for Counts Three, Four, Five, and Six, for carrying and using a deadly or dangerous weapon and causing bodily injury to Officer Mott.

## IV.    STATUTORY PENALTIES

Harrington now faces sentencing on the above offenses of conviction. As noted by the Presentence Report issued by the U.S. Probation Office, Harrington faces up to five years imprisonment, a term of supervised release of not more than three years, and a fine of up to $250,000 for Count One, up to eight years imprisonment, a term of supervised release of not more than three years, and a fine of up to $250,000 on Count Three, one year imprisonment and a fine

of up to $100,000 for each of Counts Four through Six, and up to six months imprisonment and a fine of up to $5000 for each of Counts Seven and Eight. PSR at 2-3.

## V.   THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). Here, the Guidelines should be calculated as follows.

Count One: 18 U.S.C. § 231(a)(3)

| U.S.S.G. § 2A2.2(a)[6] | Base Offense Level | 14 |
| U.S.S.G. § 2A2.2(b)(2)(B) | Dangerous Weapon | +4 |
| U.S.S.G. § 2A2.2(b)(3)(B) | Serious Bodily Injury | +5 |
| U.S.S.G. § 3A1.2(b) | Official Victim | +6 |
| U.S.S.G. §3C1.1 | Obstruction of Justice | +2 |
| | **Total** | **31** |

Count Three: 18 U.S.C. § 111(a)(1)

| U.S.S.G. § 2A2.2(a) | Base Offense Level | 14 |
| U.S.S.G. § 2A2.2(b)(3)(B) | Serious Bodily Injury | +5 |
| U.S.S.G. § 2A2.2(b)(2)(B) | Dangerous Weapon | +4 |
| U.S.S.G. § 3A1.2(b) | Official Victim | +6 |
| U.S.S.G. §3C1.1 | Obstruction of Justice | +2 |
| | **Total** | **31** |

Count Four: 18 U.S.C. § 1752(a)(1)

| U.S.S.G. § 2A2.2(a)[7] | Base Offense Level | 14 |
| U.S.S.G. § 2A2.2(b)(3)(B) | Serious Bodily Injury | +5 |
| U.S.S.G. § 2A2.2(b)(2)(B) | Dangerous Weapon | +4 |
| U.S.S.G. § 3A1.2(b) | Official Victim | +6 |
| U.S.S.G. § 3C1.1 | Obstruction of Justice | +2 |
| | **Total** | **31** |

---

[6] Counts One and Three arrive at this base offense level by cross-reference from U.S.S.G. § 2A2.4(c)(1) (Obstructing or Impeding Officers), which directs that Section § 2A2.2 (Aggravated Assault) be applied if the conduct constituted aggravated assault.

[7] U.S.S.G. § 2B2.3(c)(1): "If the offense was committed with the intent to commit a felony offense, apply §2X1.1 in respect to that felony offense, if the resulting offense level is greater than that determined above."

Count Five: 18 U.S.C. § 1752(a)(2)

| U.S.S.G. § 2A2.2(a) | Base Offense Level | 14 |
|---|---|---|
| U.S.S.G. § 2A2.2(b)(3)(B) | Serious Bodily Injury | +5 |
| U.S.S.G. § 2A2.2(b)(2)(B) | Dangerous Weapon | +4 |
| U.S.S.G. § 3A1.2(b) | Official Victim | +6 |
| U.S.S.G. § 3C1.1 | Obstruction of Justice | +2 |
| | **Total** | **31** |

Count Six: 18 U.S.C. § 1752(a)(4)

| U.S.S.G. § 2A2.2(a) | Base Offense Level | 14 |
|---|---|---|
| U.S.S.G. § 2A2.2(b)(3)(B) | Serious Bodily Injury | +5 |
| U.S.S.G. § 2A2.2(b)(2)(B) | Dangerous Weapon | +4 |
| U.S.S.G. § 3A1.2(b) | Official Victim | +6 |
| U.S.S.G. § 3C1.1 | Obstruction of Justice | +2 |
| | **Total** | **31** |

Because Counts Seven and Eight are Class B misdemeanors, the Guidelines do not apply to them. *See* 18 U.S.C. § 3559; U.S.S.G. §1B1.9.

**A. Relevant Conduct under U.S.S.G. § 1B1.3(c)**

Under a 2024 amendment to the U.S. Sentencing Guidelines, Section 1B1.3(c) states that, "[r]elevant conduct does not include conduct for which the defendant was criminally charged and acquitted in federal court, unless such conduct also establishes, in whole or in part, the instant offense of conviction." Application Note 10 states that "[t]here may be cases in which certain conduct underlies both an acquitted charge and the instant offense of conviction. In those cases, the court is in the best position to determine whether such overlapping conduct establishes, in whole or in part, the instant offense of conviction and therefore qualifies as relevant conduct." Therefore, if there are two charges for which there is no "overlapping conduct," the Guidelines calculation cannot be based in part on the conduct for which the defendant was acquitted. However, if the conduct "underlies both an acquitted charge and the instant offense of conviction," that "overlapping conduct . . . qualifies as relevant conduct." U.S.S.G. § 1B1.3 App. Note 10.

In this case, Harrington was convicted under 18 U.S.C. § 111(a)(1) for attacking Officer Mott with a flagpole. The Court acquitted Harrington under §111(b), finding that the government did not prove beyond a reasonable doubt that the flagpole was a deadly and dangerous weapon, or that the attack caused Officer Mott bodily injury. However, the very same conduct—the assault with the pole and the ensuing injury to Officer Mott—underlies both the acquitted charge of §111(b) and the instant offense of conviction" of § 111(a)(1), and therefore "qualifies as relevant conduct."

Here, this Court has already found, using the higher standard beyond a reasonable doubt, that Harrington used the flagpole to assault Officer Mott, which violated 18 U.S.C. § 111(a). Harrington's assaultive conduct that violated Section 111(a), the count of conviction—using his flagpole to strike Officer Mott—was the same conduct that supported the Section 111(b) charge, the count of acquittal. Given that "overlapping conduct" supported both counts, Application Note 10 permits this Court to consider Harrington's use of a dangerous weapon (that was capable of causing serious bodily injury) and his causing of serious bodily injury in calculating the Guidelines range.

### B. Injury

Although the Court acquitted the defendant under 18 U.S.C. § 111(b) for causing bodily injury to Officer Mott, the Court stated it was "likely and maybe even probable that this strike caused [Officer Mott's] ligament injury[.]" Trial Tr. 7/31/2024 at 6:5-6. Of course, the burden of proof at trial is beyond a reasonable doubt, but at sentencing, the Government need only prove the facts that support a Guidelines enhancement by a preponderance of the evidence. *See United States v. Lawson*, 494 F.3d 1046, 1057 (D.C. Cir. 2007). Here, for the following reasons, the government proved that Harrington caused Officer Mott's ligament injury by a preponderance.

### i.   Causation

Officer Mott testified that Harrington "cocked . . .back [the flagpole,] . . . he like loaded up." Trial Tr. 7/29/2024 at 91:2-5. In response to Harrington loading up, Mott stepped forward with his baton to defend his fellow officers. *Id.* at 91:8-9 and Gov. Ex. 200. Officer Mott specifically felt Harrington's flagpole hit him in his "left wrist area." *Id.* at 91:13-21. When Harrington hit him, Officer Mott "immediately [in] his left wrist . . . felt like a shock . . . from [his] wrist up through the back of [his] arm, as well as a burning sensation." *Id.* at 92:3-6. Officer Mott was very specific and demonstrated to the Court, by tracing up his left arm with his right finger, that the shock radiated from his left wrist through his forearm and the back of his tricep. *Id.* at 92:7-10. Officer Mott "knew something was wrong" because the pain "was pretty significant." *Id.* at 92:17. While viewing Government Exhibit 207 at 19 seconds (*See* page 15 above), Officer Mott recalled the pain radiating up his arm at the moment Harrington struck him with the pole near his left hand and wrist. *Id.* at 95:7-23. Officer Mott was not aware of anything else that caused the injury to his wrist. *Id.* 105:9-15.

Dr. Viet Do is Officer Mott's wrist surgeon and treated him for "[a] peripheral tear of the triangular fibrocartilage complex[.]" *Affidavit of Dr. Do* 11/16/2024 at ¶ 2-3. That type of tear "is generally associated with an acute, traumatic injury" and "is typically caused by either a fall with outstretched arms, or a quick, forceful twisting motion of the wrist and forearm. It is not typically caused by a direct blow."[8] *Id.* at ¶ 3-4. "Strongly holding an object" such as a police baton "typically leads to ulnar deviation of the wrist which places the triangular fibrocartilage complex at greater risk of injury during a fall or forceful rotation. *Id.* at ¶ 5. Dr. Do described "Officer

---

[8] The Court found that "the video that we have seen shows no great impact to the baton that would cause a torn ligament in the wrist[.]" However, as Dr. Do described, a direct impact is not what typically causes the type of injury suffered by Officer Mott.

Mott's left hand, wrist, and forearm [as being] in a supinated position" in Government Exhibit 207 (See second photograph on page 14 above). *Id.* at ¶ 6. Harrington's "strike caused Officer Mott's left hand, wrist, and forearm to enter a hyper-supinated position" (See photographs on page 15 above). *Id.* Dr. Do goes on to describe how "Officer Mott quickly rotate[d] his forearm and wrist from the hyper-supinated position to a pronated position" and how that "forceful twisting . . . could have caused the peripheral tear to Officer Mott's triangular fibrocartilage complex." *Id.*

During cross examination of Officer Mott, the defense raised a theory that another incident, approximately five minutes after Harrington struck Mott with the pole, could have caused the injury to Mott's wrist. In that incident, another rioter held a white pole, with a large black object attached to it, upright and walked toward the police line. Gov. Ex. 200 at 7:49. The rioter did not swing the pole toward the police line, but rather walked with it held upright into the police line. Video shows that Officer Mott raised his baton in response and the pole made contact with Officer Mott's baton near his left hand. *Id.* Officer Mott used the center of his baton to push back against the pole and push it out of the rioter's hands as the rioter fell to the ground. *Id.* at 7:50 – 7:52. There does not appear to be a forceful rotation of Officer Mott's hand, wrist, and forearm during the latter incident. Even after trial, in preparation for sentencing, Officer Mott has reviewed the videos and continues to assert that he was injured when Harrington attacked him. Officer Mott will attend sentencing and is available to further describe how and when he first felt the "significant" pain[9] he testified to at trial.

On redirect examination, Officer Mott reiterated that prior to Harrington striking him with the flagpole, he did not feel any pain in his wrist and that when Harrington did strike him, he immediately felt the shock and burning sensation in his wrist that radiated up his arm. Trial Tr.

---

[9] Trial Tr. 7/29/2024 at 92:17.

7/29/2024 at 120:20-122:7. Officer Mott stated his wrist hurt during subsequent interactions with rioters, but he was unequivocal about the first moment he felt the pain in his wrist – when Harrington hit him. *Id.* The Court found that Officer Mott "probably was" injured when Harrington struck him with the flagpole and that it was "likely and maybe even probable that this strike caused the ligament injury[.]" Trial Tr. 7/31/2024 at 6:22-7:5 and 6:5-6. Therefore, the Court should add an appropriate sentencing enhancement based on the degree of injury.

### ii.    Mott's injury meets the definition of "Serious Bodily Injury" under the Sentencing Guidelines

The PSR applies an increase of only three levels under U.S.S.G § 2A2.2(b)(3)(A), finding that Harrington caused Officer Mott only "bodily injury." PSR ¶ 62. In fact, Harrington inflicted "serious bodily injury" on Officer Mott. A victim suffers serious bodily injury when there is "protracted impairment of a bodily member . . . [that] require[es] medical intervention such as . . . surgery, hospitalization, or physical rehabilitation." *See* U.S.S.G. § 1B1.1 Application Note 1(M).

After Officer Mott was relieved of his duties on January 6, 2021, he went home, iced his wrist, took painkiller medication, and his wife, an emergency room physician assistant, examined his wrist. Trial Tr. 7/29/2024 at 99:3-6. In the weeks and months after January 6, 2021, Officer Mott continued to ice his wrist, take ibuprofen, and wore an over-the-counter wrist brace. *Id.* at 99:24-100:2. Those therapies proved insufficient, as the pain to Officer Mott's wrist did not abate. *Id.* at 93:18-19. Additionally, Officer Mott had difficulty doing certain load-bearing activities with his wrist at a 90-degree angle. *Id.* at 100:9-101:7.

Around August 2022, after his symptoms did not improve, Officer Mott sought medical care for the ongoing pain to his wrist. *Id.* at 101:16-20.   Around September 2022, Officer Mott saw an orthopedic specialist, and scheduled an MRI. *Id.* at 101:25-102:3. The MRI showed that Officer Mott "had some torn ligaments and . . . would need surgery." *Id.* at 102:4-6. On January

15, 2024, Officer Mott received an arthroscopic surgery to try and repair the torn ligaments. *Id.* at 102:8-20. After that surgery, Officer Mott's hand was immobilized for several weeks and he underwent physical therapy. *Id.* at 102:21-103:20. After the first surgery, Officer Mott's wrist continued to hurt, and it was "determined that it was not going to get better without a more invasive open surgery." *Id.* at 103:22-104:1. On May 22, 2024, Officer Mott received a second surgery followed by additional immobilization and physical therapy. *Id.* at 104:2-11 At the time of the trial, Officer Mott still wore a soft splint from his hand to the top of his forearm with a metal device with Velcro straps that attached over top of the splint and all the way up his arm to his bicep. *Id.* at 104:15-105:1. Officer Mott wore the device "24/7 unless . . . taking a shower." *Id.* at 105:2-3. The immobilization affected his ability "to get a good night's sleep[.]" *Id.* at 105:6-8.

Because Harrington's strike caused "protracted impairment of a bodily member . . . [that] require[ed] medical intervention such as . . . surgery . . . [and] physical rehabilitation" to Officer Mott's wrist, it falls within the definition of "serious bodily injury." *See* U.S.S.G. § 1B1.1 Application Note 1(M). Therefore, the five-level enhancement under U.S.S.G. § 2A2.(b)(3)(C) applies.

### C. Dangerous Weapon

The Court acquitted Harrington of using a deadly and dangerous weapon during the assault of Officer Mott. The Court was clear that an "assault occur[red] here . . . in the striking of Officer Mott in the head." Trial Tr. 7/31/2024 at 4:1-2. The Court also found that the defendant struck Officer Mott with the flagpole "forcibly . . . in an assaultive manner[.]" *Id.* at 4:9-10. The government argued that since "serious bodily injury, in fact, resulted . . . that shows that the defendant used the weapon in a manner that was capable of causing a serious bodily injury." Trial Tr. 7/31/2024 at 4:20-23. As noted above, the Court found that "it was likely and maybe even

probable that this strike caused the ligament injury[.]" *Id.* at 6:5-6. Therefore, under the lower standard of proof that applies at sentencing, the Court may find that the flagpole was used in a manner capable of inflicting serious bodily injury, and thus meets the definition of a deadly and dangerous weapon under the Sentencing Guidelines. U.S.S.G. § 1B1.1 App. Note 1(E).

The Court also addressed whether "the flagpole was otherwise capable of inflicting" serious bodily injury. Tr. 7/31/2024 at 4:23-5:7. In acquitting the defendant under this theory, the Court found "that there needs to be some other evidence that a pole of this type could have caused serious bodily injury . . . And so I just don't find the government has shown beyond a reasonable doubt that it was otherwise capable of doing so; although . . .that's a very close question." *Id.* at 6:15-21. The Court now has an affidavit from Officer Mott's treating physician describing how Harrington's strike with the flagpole could have caused the injury. Under a preponderance of evidence standard, the manner in which Harrington used the flagpole was capable of causing injury.

### D.  Obstruction of Justice

Harrington testified at trial and made several materially false statements. To apply §3C1.1, "the sentencing court must determine whether the defendant testified (1) falsely (2) as to a material fact, and (3) willfully in order to obstruct justice, not merely inaccurately as the result of confusion or a faulty memory." *United States v. Thompson*, 962 F.2d 1069, 1071 (D.C. Cir. 1992) (citations omitted).

Harrington testified falsely at trial that he waved the flagpole at the officers to get their attention because – in his view – the police were being too aggressive in defending the Capitol. Trial Tr. 7/30/2024 at 18:17 – 19:11 ("I was moving [the flagpole] upwards position to grab the attention of the officers that were – I was staring at . . . I was not intending to engage the officers.

It was only to grab their attention that if they would please stop pepper-spraying us[.]"). Harrington testified that he was moving the flagpole up and down because he "just wanted to let them know, let us have some space[.]" *Id.* at 19:17-18. He maintained throughout trial that he did not intend to assault or strike the officers with his flagpole—rather, he argued, he was trying to wave at them to get their attention.

That was demonstrably false testimony. Harrington wrapped the large flags around the pole, flipped it upside down, and used the exposed metal end—not the flag-waving end—to swing it towards the police officers. He used the side of the flagpole that would operate as a weapon to strike the officers, not the side of the flagpole used for flag waving. He lied to deflect the seriousness of what he did. He swung the flagpole at the officers several times.

At one point on cross examination, Harrington stated that he swung the flagpole "in retaliation to them pepper-spraying and throwing the other protester down the stairs." *Id.* at 67:8-9. Harrington quickly walked back that testimony. *Id.* at 67:16-18 ("Not retaliate. I take that back. It was not responding to retaliate. It was to wave my displeasure at their aggressive behavior.") Not only did the videos of Harrington's assault on Officer Mott contradict his self-serving testimony, it was clear from his text messages before and after January 6 that he intended to be violent. The Court agreed, rejected Harrington's false testimony, and convicted him of assaulting Officer Mott with the flagpole. Trial Tr. 7/31/2024 at 4:1-2 and 9-10.

Harrington also testified at trial that he researched the Proud Boys because he "thought . . . they were an organization that was pretty straight up and marched in step with some of [his] beliefs." Trial Tr. 7/29/2024 at 207:15-19. He testified that he ultimately decided not to join after speaking with his pastor and because he learned that a few members had criminal records and "were extreme enough that [he] didn't feel comfortable associating [with them] especially since

[he is] the caretaker for [his] wife and son." *Id.* at 207:17 – 208:8. Harrington testified that after sending the email to join on December 7 (Gov. Ex. 503), he researched the organization and decided that the Proud Boys did not align with his values, and therefore, stopped trying to become a member. Trial Tr. 7/30/2024 at 37:14-25. He testified that he decided not to join the Proud Boys prior to coming to the Capitol on January 6, 2021, but after sending the email to join on December 7, 2020. *Id.* at 38:1-4

Harrington's testimony on that point was directly contradicted by his text messages—in which he presumably believed he could communicate his candid thoughts to close associates and friends. Harrington was proud of having fought alongside members of the Proud Boys at the Million MAGA March and bragged to his friend that the Proud Boys "hired" him "on the spot" because of his aggressiveness. Gov. Ex. 508 at 1. Harrington described the Proud Boys as a "good organization or honorable[.]" *Id.* at 2.

A week after the Million MAGA March, Harrington continued to brag that he "helped the proud boys kick ass" at the rally. *Id.* at 7. Even two days before January 6, 2021, Harrington aligned himself with the Proud Boys, writing that "*we* got funds for [Enrique Tarrio's] defense[.]" Gov. Ex. 507 at 5 (emphasis added). Regardless of whether or not Harrington was a member of the Proud Boys, Harrington's efforts to join and his support of their ideology is material to his intent and motive for attending January 6, 2021. Ultimately, Harrington attempted to mislead the Court during his testimony about whether he aligned with the Proud Boys in the weeks and days leading up to January 6.

### E. Grouping

Under U.S.S.G. §3D1.2, "closely related counts" group. Harrington's seven counts of conviction form one group. Counts One, Five, and Six group because under §3D1.2(a) or

§3D1.2(b) they involve "the same victim" and same course of conduct. Count One does involve additional assaultive conduct not encompassed in Count Three (the second push of the police line, grabbing an officer's baton, and pushing on the shield). However, Counts One and Three do group pursuant to U.S.S.G. § 3D1.2(c) because Count Three (the assault of Officer Mott with the flagpole) embodies conduct that is treated as a specific offense characteristic in the guideline applicable to Count One (specifically, the four-level enhancement for use of a dangerous weapon in U.S.S.G. § 2A2.2(b)(1)(B)). Count Four (18 U.S.C. § 1752(a)(1)) groups with the other counts pursuant to U.S.S.G. § 3D1.2(c) because Count Four also embodies conduct—namely, the assault—that is an adjustment to Counts One, Three, Five, and Six (namely, U.S.S.G. § 3A1.2(c), a six-level increase because the offense involved an assault against an officer committed in a manner creating a substantial risk of serious bodily injury). Therefore, the combined offense level is 31. Counts Seven and Eight are not grouped because the Guidelines do not apply to it.

The U.S. Probation Office calculated Harrington's criminal history as category I, which is not disputed. PSR ¶ 82. Accordingly, based on the government's calculation of Harrington's total adjusted offense level, Harrington's Guidelines imprisonment range is 108-135 months' imprisonment.

## VI.    SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). As described below, on balance, the Section 3553(a) factors weigh in favor of a lengthy term of incarceration. Even if the Court does not find the enhancements under U.S.S.G. § 2A2.2(b)(3)(B) or U.S.S.G. § 2A2.2(b)(2)(B) apply, the Court should vary upwards based on the factors set forth in Section 3553(a).

### A.    Nature and Circumstances of the Offense

As shown in Section II(B) of this memorandum, Harrington's felonious conduct on January

6 was part of a massive riot that almost succeeded in preventing the certification vote from being carried out, frustrating the peaceful transition of Presidential power, and throwing the United States into a Constitutional crisis. Harrington broke away from the crowd to taunt, and then assault, multiple officers. Harrington stayed on the grounds for hours. His motive was clear: to stop the peaceful transfer of power through vicious force. The nature and circumstances of Harrington's offenses were of the utmost seriousness, and fully support the government's recommended sentence of 96 months incarceration.

###### B.    Harrington's History and Characteristics

Harrington is a retired Navy Reservist. PSR ¶ 126. Much of his trial testimony was spent discussing his military service. However, given his conduct, training, and experience, his military service is anything but mitigating. Part of his job in the Navy was constructing restricted perimeters. Trial Tr. 7/30/2024 31:3-6.   Harrington testified about his training in weapons and martial arts. Trial Tr. 7/29/2024 at 197:14-17; 202:14-204:14. Harrington even testified that while he was in the military he was trained in the use of riot gear that was similar to what the MPD officers were wearing on January 6. Trial Tr. 7/30/2024 at 15:24-16:5.

Harrington used that training and experience in preparation for, and during, January 6, 2021. Harrington brought a painter's respirator mask to the Capitol on January 6. Trial Tr. 7/29/2024 at 211:3-7. Harrington knew chemical irritants might be used by MPD and he intended to withstand them. *Id.* at 211:19-20.

Harrington also tried to leverage his status as a veteran to encourage others to participate in the January 6 riot. For example, in a message sent on December 22, 2020, he discussed the oath he "TOOK . . . TO PROTECT THE CONSTITITON FROM ENEMIES FOREIGN AND DOMESTIC[.]" Harrington went on to identify the enemies. "THE ENEMY IS THE UNITED

STATES CONGRESS BOTH HOUSES ALONG WITH THE SENATE AND TO THE DISGRACE SCOTUS[.]" The fact that he took an oath to defend the Constitution prior to the conduct he participated in on January 6 is aggravating, not mitigating.

Harrington will no doubt point to his minor child's special needs and his wife's illness at sentencing as mitigators. Harrington was aware of his wife and child's needs when he went to Washington D.C. on January 6 and attacked police officers. In fact, he cites those responsibilities as one of the reasons for supposedly not joining the Proud Boys. Trial Tr. 7/29/2024 at 208:4-8.

### C. The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

As with the nature and circumstances of the offense, this factor supports a sentence of incarceration. Harrington's criminal conduct on January 6 was the epitome of disrespect for the law. Harrington continued to demonstrate his lack of respect for the law through his continuous posts and messages deriding prosecution of crimes related to January 6 and promoting further political violence. Harrington attempted to mislead the Court about breaking ties with the Proud Boys and proffered demonstrably false testimony about waving the flagpole in a communicative, rather than assaultive manner towards the police.

### D. The Need for the Sentence to Afford Adequate Deterrence

#### *General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C. § 3553(a)(2)(B). The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[10] The demands of general

---

[10] *See* 18 U.S.C. § 2331(5) (defining "domestic terrorism").

deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.

### *Specific Deterrence*

The need for the sentence to specifically deter Harrington also weighs heavily in favor of a lengthy term of incarceration.

Harrington has not shown any remorse for his actions on January 6, 2021. He never took any responsibility for striking Officer Mott with the flagpole. To the contrary, he blamed Officer Mott for defending his fellow officers from Harrington's attacks with the flagpole. Trial Tr. 7/30/2024 at 24:24-25:4 ("he came down and approached me, he came into the direction I was swinging the flagpole and it made contact with his billy club . . . and . . . helmet."). Similarly, when testifying about pushing into the police line with the large piece of opaque material, he attempted to blame others, saying he was "goaded" into doing so by other rioters. Trial Tr. 7/30/2024 at 75:16-20. In reality, Harrington was a ready and willing participant. He joined with a large group of rioters to push the material into the line and then continued to attack by grabbing an officer's baton and pushing on a riot shield. Even after this attack, Harrington stayed on the steps of the Upper West Terrace and resisted police efforts to clear the area. Harrington actively participated in violence on January 6, just as he said he would in his text messages leading up to that day.

Harrington's lack of remorse was compounded by his perjured trial testimony, discussed above. Immediately after January 6 and in the months following, Harrington has spewed vitriolic rhetoric in messages directed at elected officials and the police. For example, on the evening of January 6, 2021, Harrington texted "F*** the DC Police." On July 28, 2021, he texted, "I want them all in prison starting from VP pence down to mitch mcConnel[.]" Gov. Ex. 507 at 6-7. Accordingly, this Court should be skeptical of any belated expression of remorse by Harrington at

the sentencing hearing. *See United States v. Matthew Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 29-30 ("[The defendant's] remorse didn't come when he left that Capitol. It didn't come when he went home. It came when he realized he was in trouble. It came when he realized that large numbers of Americans and people worldwide were horrified at what happened that day. It came when he realized that he could go to jail for what he did. And that is when he felt remorse, and that is when he took responsibility for his actions.") (statement of Judge Chutkan).

### E. The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007) (quoting *Rita*, 551 U.S. at 349); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise," and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108 (cleaned up). Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101.

### F. Unwarranted Sentencing Disparities

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar *conduct*" (emphasis added). So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and

consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007).

Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095. "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).[11] "When an offense is uniquely serious,

---

[11] If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

courts will consider the need to impose stiffer sentences that justify the risk of potential disparities." *United States v. Mattea*, 895 F.3d 762, 768–69 (D.C. Cir. 2018) (cleaned up).

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences.[12] While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the conduct in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

In *United States v. Craig Bingert,* 21-cr-00091(RCL), the defendant and his codefendants lifted a metal bike rack barricade and pushed it into a line of police officers at the top of the stairs leading to the Upper West Terrace. Bingert and his codefendants struck an officer in the leg with the barricade. After attacking police, Bingert watched the violence at the Lower West Terrace tunnel for almost an hour and watched other rioters drag a police officer into the crowd. Bingert consented to his phone being searched and agents found texts about the official proceeding taking place on January 6, 2021 and screenshots of social media posts about election fraud. A jury convicted Bingert of obstruction of the certification proceeding in violation of 18 U.S.C. § 1512(c)(2), assaulting officers in violation of 18 U.S.C. § 111(a), civil disorder in violation of 18 U.S.C. § 231(a)(3), and several misdemeanors. Although Bingert caused injury but not "serious bodily injury", Judge Lamberth sentenced him to 96 months of incarceration based on a Guidelines range of 135 to 168 months.

---

[12] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

Much like Bingert pushing a metal bike rack at a police line, Harrington joined a group of rioters to push an opaque piece of material at the police line, obstructing the officers view and using the object to avoid being pepper sprayed as the rioters advanced on the police line and assaulted officers. Harrington continued the attack by grabbing an officer's baton and pushing against a police shield. Prior to that, Harrington caused a serious wrist injury to Officer Mott when he attacked him with the flagpole. Harrington swung the pole at multiple officers on the line. While the § 1512(c)(2) count was dismissed in this case, the evidence at Harrington's trial demonstrated that Harrington was motivated by his desire to stop the peaceful transfer of power and viewed Congress as the enemy in a war he was fighting. Harrington's Guidelines range do not account for his intent to obstruct the certification proceeding.

In *United States v. Stephen Randolph et al.,* 21-cr-537 (JMC), the defendant lifted a metal bike rack with his codefendants and pushed a line of U.S. Capitol Police Officers backwards. Randolph struck one officer in the face with the bike rack and caused her to fall backward and strike her head on the handrail and stairs behind her. The officer suffered a concussion and struggled with migraines for months. The officer needed rehabilitation and medical treatment before being able to return to full duty. After injuring that officer, Randolph leapt over the barricade to attack a second officer. Randolph bragged about his participation in the riot to an undercover agent. Judge Cobb convicted Randolph of 18 U.S.C. § 111(b) and sentenced him to 96 months' incarceration based on a Guidelines range of 108 to 135 months.

While Randolph was convicted of violating § 111(b), like Harrington, he used a makeshift weapon to assault officers and caused serious injury to an officer. Randolph used a bike-rack to assault officers while Harrington used a flagpole to attack and to seriously injure an officer. Just as Randolph leapt over the bike-rack after his initial attack to assault another officer, Harrington

continued to attack officers by pushing into the police line, grabbing an officer's baton, and pushing into a police shield. Like Randolph bragging about his participation in the January 6 riot to an undercover officer, Harrington bragged in text messages and online posts about his violent participation in the January 6 riot.

In *United States v. Rodney Milstreed*, 22-cr-198 (JEB), the defendant pled guilty to one count of violating 18 U.S.C. § 111(b) and this Court sentenced the defendant to 60 months of incarceration. While the defendant pled guilty to § 111(b), his conduct leading up to, and during January 6, is strikingly similar to Harrington's and is worth comparison. In *Milstreed*, the defendant sent several Facebook messages anticipating violence on January 6, including that he planned to "f*** these punks up" and predicted civil war. Harrington sent similar messages like his plan for "Kicking down punks and crippling them hurting them so they know who's street it belongs too ITS WE THE PEOPLE THE TAXPAYERS[.]" Both Harrington and Milstreed referred to the election and certification process as the beginning of a civil war. Both Milstreed and Harrington believed the election was stolen and followed election-related lawsuits. Milstreed wrote on Facebook "THESE JUDGES BETTER DO THE RIGHT THING." Harrington texted "If Supreme Court don't rectify the EVIL that's prayer time ad what God wants his warriors to do next." Both men hoped and expected that Trump would continue to occupy the White House and were willing to use violence to assist that goal. For example, Milstreed posted in response to a post by President Trump "To hell with them Trump don't hand over the keys. We will handle the outside u handle the inside." Harrington similarly texted that he "would love to get a battalion of warriors and block the white house from them defiling the peoples house . . . [.]" Just as Harrington tried to join the East Idaho Proud Boys, Milstreed "put a bid in to join proud boys" by emailing the Maryland Proud Boys.

On January 6 itself, Milstreed threw a wooden flagpole at a police line and struck an officer in the helmet causing a concussion requiring medical treatment. Harrington also used a flagpole to assault officers, causing injury to Officer Mott. Neither Milstreed nor Harrington stopped there. Milstreed grabbed and shoved an Associated Press photographer, threw a smoke grenade deployed by police back at the police line, and tried to pull away a bike rack from a police line until the police sprayed him with pepper spray. Harrington joined a group of other rioters to try and push through the police line then grabbed an officer's baton and pushed into a riot shield. Neither Harrington nor Milstreed were able to enter the Capitol, but both men made clear their intent to take over the building: Milstreed wrote on January 6 that he was "Getting ready to take the building"; Harrington wrote that he was trying to "claim the Capitol" and that that he was "breaking down fencing to gain entry into the Capitol building[.]" Afterwards, both men bragged about their violent participation in the riot and sent messages clearly demonstrating that they believed they had done nothing wrong. While the conduct by both defendants is very similar, Harrington should receive a harsher sentence. Milstreed pled guilty and accepted responsibility for his actions, while Harrington has not accepted responsibility, has demonstrated no remorse, and testified falsely at trial.

## VII.   RESTITUTION

Under 18 U.S.C. § 3556, a sentencing court must determine whether and how to impose restitution in a federal criminal case. Because a federal court possesses no "inherent authority to order restitution," *United States v. Fair*, 699 F.3d 508, 512 (D.C. Cir. 2012), it can impose restitution only when authorized by statute, *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011). First, the Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with

discretionary authority to order restitution to victims of most federal crimes." *Papagno*, 639 F.3d at 1096; *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA). Second, the Mandatory Victims Restitution Act ("MVRA"), Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA. *Papagno*, 639 F.3d at 1096. The MVRA applies to certain offenses including those "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss," 18 U.S.C. § 3663A(c)(1)(B), a "crime of violence," § 3663A(c)(1)(A)(i), or "an offense against property … including any offense committed by fraud or deceit," § 3663A(c)(1)(A)(ii). *See Fair*, 699 F.3d at 512 (citation omitted). But Harrington was convicted of a violation of an offense under Title 18, the VWPA does apply.

The applicable procedures for restitution orders issued and enforced under these two statutes is found in 18 U.S.C. § 3664. *See* 18 U.S.C. § 3556 (directing that sentencing court "shall" impose restitution under the MVRA, "may" impose restitution under the VWPA, and "shall" use the procedures set out in Section 3664).

Both [t]he VWPA and MVRA require identification of a victim, defined in both statutes as "a person directly and proximately harmed as a result of" the offense of conviction. *Hughey v. United States*, 495 U.S. 411, 418 (1990) (interpreting the VWPA). Both statutes identify similar covered costs, including lost property and certain expenses of recovering from bodily injury. *See Papagno*, 639 F.3d at 1097-97; 18 U.S.C. §§ 3663(b), 3663A(b). Finally, under both the statutes, the government bears the burden by a preponderance of the evidence to establish the amount of loss suffered by the victim. *United States v. Bikundi*, 926 F.3d 761, 791 (D.C. Cir. 2019).

In deciding whether to impose restitution under the VWPA, the sentencing court must take account of the victim's losses, the defendant's financial resources, and "such other factors as the

court deems appropriate." *United States v. Williams*, 353 F. Supp. 3d 14, 23-24 (D.D.C. 2019) (quoting 18 U.S.C. § 3663(a)(1)(B)(i)). The MVRA, by contrast, requires imposition of full restitution without respect to a defendant's ability to pay.[13]

Because Harrington engaged in criminal conduct in tandem with hundreds of other defendants charged in other January 6 cases, and [his or her] criminal conduct was a "proximate cause" of the victims' losses if not a "cause in fact," the Court has discretion to apportion restitution and hold Harrington responsible for his individual contribution to the victims' total losses. *See Paroline v. United States*, 572 U.S. 434, 458 (2014) (holding that in aggregate causation cases, the sentencing court "should order restitution in an amount that comports with the defendant's relative role in the causal process that underlies the victim's general losses"). *See also United States v. Monzel*, 930 F.3d 470, 476-77, 485 (D.C. Cir. 2019) (affirming $7,500 in restitution toward more than a $3 million total loss, against a defendant who possessed a single pornographic image of the child victim; the restitution amount was reasonable even though the "government was unable to offer anything more than 'speculation' as to [the defendant's] individual causal contribution to [the victim's] harm"; the sentencing court was not required to "show[] every step of its homework," or generate a "formulaic computation," but simply make a "reasoned judgment."); *cf.* 18 U.S.C. § 3664(h) ("If the court finds that more than 1 defendant has contributed to the loss of a victim, the court … may apportion liability among the defendants to reflect the level of contribution to the victim's loss and economic circumstances of each defendant.").

More specifically, the Court should require Harrington to pay $2,000 in restitution for his convictions on Counts One and Three. This amount fairly reflects Harrington's role in the offense

---

[13] Both statutes permit the sentencing court to decline to impose restitution where doing so will "complicat[e]" or "prolong[]" the sentencing process. *See* 18 U.S.C. §§ 3663(a)(1)(B)(ii), 3663A(c)(3)(B).

and the damages resulting from his conduct. Moreover, in cases where the parties have entered into a guilty plea agreement, two thousand dollars has consistently been the agreed upon amount of restitution and the amount of restitution imposed by judges of this Court where the defendant was not directly and personally involved in damaging property. Accordingly, such a restitution order avoids sentencing disparity.

In addition to accounting for the damage to the Capitol, Harrington should be required to pay restitution to the victim of his violent assault, Officer Mott. The evidence clearly showed by a preponderance that Harrington caused Officer Mott's injury. He should be required to pay the costs incurred by Officer Mott under 18 U.S.C. § 3663(b)(2). The government asks the Court to hold open the matter of restitution for a period of 90 days to provide an accurate accounting of medical costs incurred by Officer Mott to establish the appropriate amount of restitution.

## VIII.   FINE

Harrington's convictions for violations of 18 U.S.C. §§ 111(a) and 231 subject him to a statutory maximum fine of $250,000. *See* 18 U.S.C. § 3571(b). In determining whether to impose a fine, the sentencing court should consider Harrington's income, earning capacity, and financial resources. *See* 18 U.S.C. § 3572(a)(1); *See* U.S.S.G. § 5E1.2(d). The sentencing guidelines provide for a fine in all cases, except where the defendant establishes that he is unable to pay and is not likely to become able to pay any fine. U.S.S.G. § 5E1.2(a), (e) (2023).

The burden is on Harrington to show present and prospective inability to pay a fine. *See United States v. Gewin*, 471 F.3d 197, 203 (D.C. Cir. 2006) (explaining that "it makes good sense to burden a defendant who has apparently concealed assets" to prove that "he has no such assets and thus cannot pay the fine"); *United States v. Lombardo*, 35 F.3d 526, 528 (11th Cir. 1994).

Here, Harrington has not shown an inability to pay, thus pursuant to the considerations

outlined in U.S.S.G. § 5E1.2(d), the Court has authority to impose a fine. § 5E1.2(a), (e).

## IX.    CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a sentence of 96 months incarceration, followed by 36 months of supervised release, $2000 in restitution to Architect of the Capitol and restitution in an amount to be determined to Officer Mott, and the mandatory assessment of $100 for each felony conviction, $25 for each class A misdemeanor conviction, and $10 for each class B misdemeanor conviction.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY

BY:    _/s/ Kyle R. Mirabelli_____
       Kyle R. Mirabelli
       N.Y. Bar No. 5663166
       Carlos A. Valdivia
       D.C. Bar No. 1019242
       Assistant United States Attorneys
       U.S. Attorney's Office
       District of Columbia
       Telephone No: (212) 252-7884
       Email Address: kyle.mirabelli@usdoj.gov