UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| | : | **CASE NO. 23-CR-298-JEB** |
| v. | : | |
| | : | |
| DOUGLAS HARRINGTON, | : | |
| | : | |
| Defendant. | : | |

## DOUGLAS HARRINGTON'S SENTENCING MEMORANDUM

Douglas Harrington, through undersigned counsel, Deputy Federal Public Defenders Jake Crammer & Lisa LaBarre, hereby submits his sentencing memorandum for this Honorable Court's consideration.

## I.    INTRODUCTION

Mr. Harrington regrets the actions he took on January 6, 2021, not because he fears the consequences for his actions, but because he recognizes now that these actions were foolish, dishonorable, and out of line with his sense of right and wrong. He is sorry, has repented of his mistakes, and promises the Court to never let himself be put in a similar position again. (*See* Exh. A - Doug Harrington Letter). In fact, over the nearly four years that have passed since Mr. Harrington committed these crimes, Mr. Harrington has not come close to committing any similar mistakes. On the contrary, he has spent these last few years the way he has spent the lion's share of his life: taking care of his family and serving his community. Looking to the whole of Mr. Harrington's life, it will become clear that his actions on January 6, 2021 were a criminal blip on an otherwise admirable life.

That said, Mr. Harrington's actions were serious, serious enough to warrant punishment. He is placing himself at the Court's mercy, knowing that he will need to spend some time in

custody to atone for his past wrongs. Although he argues that the guideline range in the PSR and in the government's SPP are inflated, he does not contest that he will need to serve some time. He asks only that he be sentenced fairly under the guidelines currently in effect, and that he be sentenced not only according to his mistakes, but also according to his life as a whole.

Mr. Harrington respectfully requests that the Court sentence him to a term of imprisonment of 18 months, two years of supervised release, and $2,000 in restitution. For the reasons set forth below, this is a fair sentence that is sufficient but not greater than necessary to accomplish the goals of sentencing set forth in 18 U.S.C. § 3553(a).

## II.    FACTUAL & PROCEDURAL BACKGROUND

On August 30, 2023, Mr. Harrington was indicted with eight charges relating to his actions at the January 6, 2021 demonstration in Washington, D.C. (Dkt. 12). The indictment included the following charges:

- Count One: Obstructing, Impeding, or Interfering with Law Enforcement During a Civil Disorder (18 U.S.C. § 231(a)(3));

- Count Two: Obstruction of an Official Proceeding and Aiding and Abetting (18 U.S.C. §§ 1512(C)(2), 2);

- Count Three: Assaulting, Resisting, or Impeding Certain Officers Using a Deadly or Dangerous Weapon or Inflicting Bodily Injury (18 U.S.C. § 111(a)(1), (b));

- Count Four: Entering and Remaining in a Restricted Building or Grounds with a Deadly and Dangerous Weapon (18 U.S.C. § 1752(a)(1), (b)(1)(A));

- Count Five: Disorderly and Disruptive Conduct in a Restricted Building or Grounds with a Deadly and Dangerous Weapon (18 U.S.C. § 1752(a)(2), (b)(1)(A));

- Count Six: Act of Physical Violence in a Restricted Building or Grounds with a Deadly and Dangerous Weapon (18 U.S.C. § 1752(a)(4), (b)(1)(A));

- Count Seven: Disorderly Conduct in Capitol Grounds (40 U.S.C. § 5104(e)(2)(D)); and

- Count Eight: Act of Physical Violence in Capitol Grounds (40 U.S.C. § 5104(e)(2)(F)).

(Dkt. 12).

Before trial, the Court granted the government's motion to dismiss Count Two due to the recent Supreme Court opinion in *Fischer v. United States*, 144 S.Ct. 2176 (2024). (Dkt. 34; July 10, 2024 Minute Order). A bench trial commenced in this matter on July 29, 2024, and the Court rendered a verdict three days later on July 31, 2024. The Court convicted Mr. Harrington of Counts One, Seven, and Eight. The Court acquitted Mr. Harrington of the aggravated counts in Counts Three through Six, but convicted him of the lesser-included offenses for each of these counts.

Mr. Harrington will face the Court to be sentenced on November 25, 2024.

## III.    SENTENCING GUIDELINES CALCULATION AND OBJECTIONS

Mr. Harrington raises several objections to the guideline range calculated by the USPO and the government, all of which are detailed below. The proper guideline range in this case is **total offense level 20 x criminal history category 1, producing a recommended sentence of 33-41 months.**

A.    **The Court should not impose enhancements premised on "acquitted conduct" as defined in U.S.S.G. § 1B1.3(c)**

a.    **The 2024 Guidelines exclude "acquitted conduct" from "relevant conduct"**

In July of this year, the United States Sentencing Commission voted to amend the United States Sentencing Guidelines to exclude acquitted conduct from the range of relevant conduct that the Court may consider when calculating a person's guideline range. Specifically, the Commission added the following language to the definition of Relevant Conduct under USSG § 1B1.3: "Relevant conduct does not include conduct for which the defendant was criminally charged and acquitted in federal court, unless such conduct also establishes, in whole or in part, the instant offense of conviction."  USSG § 1B1.3(c) (2024 ed.).  Before the passage of this amendment, multiple judges, including Supreme Court Justices, had urged the Sentencing Commission to reconsider the use of acquitted conduct at sentencing. *See, e.g.*, *McClinton v. United States*, 143 S. Ct. 2400, 2401 & n.2 (2023) (Sotomayor, J., Statement respecting the denial of certiorari) (collecting cases and statements opposing acquitted-conduct sentencing). Congress is also currently considering legislation that would preclude acquitted conduct from being considered at sentencing with rare bipartisan support. Prohibiting Punishment of Acquitted Conduct Act of 2023, S. 2788, 118th Cong. (1st Sess. 2023); Prohibiting Punishment of Acquitted Conduct Act of 2023, H.R. 5430, 118th Cong. (1st Sess. 2023).

Because this amendment is currently in effect and decreases Mr. Harrington's guidelines range, the Court must apply the 2024 edition of the United States Sentencing Guidelines to Mr. Harrington's case.  USSG § 1B1.11(a) ("The court shall use the Guidelines Manual in effect on the date that the defendant is sentenced."); *but see Peugh v. United States*, 569 U.S. 530, 533

(9th Cir. 2013) (holding that it is "an ex post facto violation when a defendant is sentenced under Guidelines promulgated after he committed his criminal acts and the new version provides a higher applicable Guidelines sentencing range than the version in place at the time of the offense."); U.S.S.G. 1B1.11(b)(1) ("If the court determines that use of the Guidelines Manual in effect on the date that the defendant is sentenced would violate the ex post facto clause of the United States Constitution, the court shall use the Guidelines Manual in effect on the date that the offense of conviction was committed."). As such, the Court cannot impose sentencing enhancements on the basis of acquitted conduct in this case.

### b. The government and USPO are seeking enhancements premised on acquitted conduct

Despite this recent amendment to the guidelines, both the government and USPO are seeking enhancements premised on the conduct for which Mr. Harrington was acquitted at trial. As to Group One, the PSR recommends a four-level enhancement for using a dangerous weapon under USSG § 2A2.2(b)(2)(B) and a three-level enhancement for causing bodily injury under USSG § 2A2.2(b)(3)(A). (PSR ¶¶ 61-62). As to Group Two, the PSR also recommends a three-level enhancement for using a dangerous weapon under USSG § 2A2.4(b)(1). (PSR ¶ 68). The government concurs with the PSR's recommendation with regard to the dangerous weapon enhancement under Section 2A2.2(b)(2)(B), but contends the Court should apply a higher five-level enhancement under USSG § 2A2.2(b)(3)(B) for causing *serious* bodily injury.[1] (Gov. SPP 23-30).

---

[1] The government contends that USSG § 2A2.2 should apply to all counts of conviction, so it does not recommend any enhancements under USSG § 2A2.4. (Gov. SPP 23-24).

All four of these enhancements are premised on "conduct for which [Mr. Harrington] was criminally charged and acquitted in federal court." USSG § 1B1.3(c). Mr. Harrington was acquitted of the aggravated counts charged as Counts Three through Six in the Indictment, and he was convicted of the lesser included offenses for those counts. (PSR ¶ 4). By acquitting Mr. Harrington of these aggravated counts, the Court acquitted him of having used his flagpole as a dangerous weapon and of causing Officer Mott bodily injury. For Count Three, Mr. Harrington was acquitted of 18 U.S.C. § 111(b) . This means he was acquitted of both "us[ing] a deadly or dangerous weapon" and "inflict[ing] bodily injury." 18 U.S.C. § 111(b). For Counts Four through Six, Mr. Harrington was acquitted of the aggravated offenses enumerated under 18 U.S.C. § 1752(b)(1)(A). This means he was acquitted of "us[ing] or carry[ing] a deadly or dangerous weapon or firearm." 18 U.S.C. § 1752(b)(1)(A).

If the statutory language in itself was not enough, the Court issued a clear and detailed verdict in which it specified that it was acquitting Mr. Harrington of this aggravated conduct specifically:

A.    Mr. Harrington was acquitted of using his flagpole to inflict serious bodily injury on Officer Mott. Trial Tr. 7/31/24 at 6:01-07.

B.    Mr. Harrington was acquitted of using or carrying a flagpole that was capable of causing serious bodily injury. Trial Tr. 7/31/24 at 6:14-21.

C.    Mr. Harrington was acquitted of using his flagpole to inflict bodily injury on Officer Mott. Trial Tr. 7/31/24 at 6:22-7:12.

### c.   The acquitted conduct in question does not constitute "overlapping conduct" under USSG § 1B1.3(c)

The government and USPO contend that the enhancements challenged above are based on *overlapping* conduct, rather than *acquitted* conduct, but their arguments are unavailing. The guidelines clarify that while "[r]elevant conduct does not include conduct for which the defendant was criminally charged and acquitted in federal court," it does include conduct that "also establishes, in whole or in part, the instant offense of conviction." USSG § 1B1.3(c). In application note 10, the Sentencing Commission further explained this exception: "There may be cases in which certain conduct underlies both an acquitted charge and the instant offense of conviction. In those cases, the court is in the best position to determine whether such overlapping conduct establishes, in whole or in part, the instant offense of conviction and therefore qualifies as relevant conduct." U.S.S.G. § 1B1.3(c), app. note 10. The Court must ask itself, then, does the conduct on which these enhancements are predicated underly both the acquitted charge and the instant offense of conviction? The answer to that question here is no, so the Court should not apply these enhancements.

Let's start by defining the conduct at issue. As to the dangerous weapon enhancements, Section 2A.2(b)(2)(B) applies if "a dangerous weapon (including a firearm) was otherwise used" in the commission of the offense, and Section 2A.2.4(b)(1) applies if "a dangerous weapon (including a firearm) was possessed and its use was threatened." As to bodily injury, Section 2A2.2(b)(3) applies "[i]f the victim sustained bodily injury," applying varying degrees of enhancements depending on the severity of the injury. Reviewing the charges of *conviction* in this case, not a single one includes the use or possession of a "dangerous weapon" as an element. Nor do any of the charges of conviction include the infliction of bodily injury as an element. The

conduct underlying these enhancements, then, does *not* "establish[], in whole or in part, the instant offense[s] of conviction."

In its position paper, the government argues that the Court should construe "overlapping" conduct in a way that would eviscerate the "acquitted conduct" exemption under Section 1B1.3(c)—it would have the exception to acquitted conduct swallow the rule. The government argues that because the Court found Mr. Harrington guilty of 18 U.S.C. § 111(a) for "using his flagpole to strike Officer Mott," the Court can enhance Mr. Harrington's sentence on the basis of acquitted conduct, so long as the acquitted conduct involved striking Officer Mott with a flagpole. (Gov. SPP at 24-25).

But Section 1B1.3(c) and Application Note 10 actually serve the inverse purpose. That is, the overlapping conduct exception to the acquitted conduct preclusion ensures that a defendant will not escape the consequences for the offense of conviction, merely because some of that conduct overlaps with a charge for which the defendant was acquitted. To make this point, the defense will use as an example the enhancement for "Official Victim" under Section 3A1.2(b). (*See* PSR ¶ 63). As the Court knows, Mr. Harrington was acquitted of assaulting Officer Mott under 18 U.S.C. § 111(b), but he was convicted of assaulting Officer Mott under the lesser-included offense 18 U.S.C. § 111(a). If the acquitted conduct provision merely exempted all acquitted conduct *without* an "overlapping conduct" exception, then it could technically lead to the conclusion that Mr. Harrington should not receive any sentence for Section 111(a). Technically, Section 111(a) would be premised on the same exact conduct included in Section 111(b), so premising the "Official Victim" enhancement under Section 3A1.2(b) would be improper.

In order to avoid such an absurd result, the acquitted conduct provision includes the "overlapping conduct" exception, in order to clarify that a defendant should still be sentenced for conduct underlying their *convictions*, even if that conduct at times overlaps with the conduct in the same defendant's acquitted counts. Here, because the Court convicted Mr. Harrington of violating 18 U.S.C. § 111(a) by striking Officer Mott with a flagpole, and because Officer Mott constitutes an official victim under Section 3A1.2(b), the six-level "Official Victim" enhancement is proper. This is the case even though Mr. Harrington was acquitted of 18 U.S.C. § 111(b), because the Official Victim enhancement is premised not on the conduct for which Mr. Harrington was acquitted, but on the conduct that overlaps with Section 111(a): striking Officer Mott (an official victim) with a flagpole.

The Court nonetheless may not consider the conduct for which Mr. Harrington was acquitted—that is, the conduct that does not overlap between the acquitted aggravated charges (18 U.S.C. § 111(b) and 18 U.S.C. § 1752(b)(1)(A)) and the lesser-included offenses of which Mr. Harrington was convicted. Because Mr. Harrington was acquitted of both using a dangerous weapon and causing bodily injury, and because this conduct does not overlap with the instant offenses of conviction, the Court may not apply enhancements premised on the use or possession of a dangerous weapon or the infliction of bodily injury.

By adopting the government's position on this point, the Court would effectively nullify the acquitted conduct amendment in one of the contexts where it is most necessary: situations in which a defendant goes to trial in order to defeat an aggravated charge and is ultimately convicted of a lesser-included offense. If the Court adopts the defense's position regarding the "overlapping conduct" exception, however, it will address the concerns raised by multiple jurists that led to the acquitted conduct amendment in the first place. The Court will preserved the

"perceived fairness" of the criminal system. *McClinton*, 143 S.Ct. at 2401 (Sotomayor, J., Statement respecting the denial of certiorari). It will also avoid the risk that "using acquitted conduct to increase a defendant's sentence undermines respect for the law and the jury system." *United States v. Settles*, 530 F.3d 920, 924 (D.C. Cir. 2008); *see also United States v. Bell*, 808 F.3d 926, 932 (D.C. Cir. 2015) (Millett, J., concurring in the denial of reh'g *en banc*) (noting the seeming unfairness that defendants "face all the risks of conviction, with no practical upside to acquittal unless they… are absolved of all charges).

### d.  The government cannot establish that Mr. Harrington inflicted bodily injury on Officer Mott by a preponderance of the evidence

Acquitted conducts argument aside, the government cannot establish that Mr. Harrington caused Officer Mott's injury by a preponderance of the evidence. Officer Mott testified that his left wrist was injured by Mr. Harrington on January 6, 2021, but he did not seek any medical attention for this injury until August of 2022, 20 months later. Trial Tr. 7/29/24 at 101:16:-20. He did not receive surgery for this injury until January 15, 2024, over three years after his encounter with Mr. Harrington. Trial Tr. 7/29/24 at 102:08-09. This distance in time between allegedly sustaining the injury and seeking treatment raises serious doubts about whether Mr. Harrington truly caused Officer Mott's wrist injury.

Still, there are even stronger reasons to question whether Officer Mott's wrist injury can be traced to Mr. Harrington's conduct. As was revealed at trial, Officer Mott had another encounter *on January 6* with someone who struck his baton with a pipe. Trial Tr. 7/29/24 at 111:12-112:12; Gov. Exh. 200 at 7:48-8:20. After Officer Mott was struck by the unknown demonstrator's pipe, he behaved like someone who had just sustained an injury: he wrenched the pipe out of the demonstrator's hand, hit the demonstrator with his baton at least three times,

made a point to hand the pipe back behind the police line, and withdrew from the police line just moments later. Trial Tr. 7/29/24 at 112:04-113:18; Def. Exhibit 1009 at 7:38-7:48. Officer Mott's withdrawal from the police line at this point is especially notable, because he remained on the front line after his altercation with Mr. Harrington, suggesting that he had not been injured. Furthermore, in the aftermath of the January 6 demonstration, Officer Mott described his injury as being caused by a *pipe* (rather than a flagpole), only referring to the weapon as a flagpole after the government approached him regarding the instant case. Trial Tr. 7/29/24 at 116:08-119:20. To be clear, the defense is not suggesting that Officer Mott has attempted to intentionally mislead the Court. The defense is arguing that these factors indicate that Officer Mott's memory may have faltered and he may have been understandably swayed by the government's theory in this case.

But the reasons to doubt do not end there. It also must be noted that in the years between January 6, 2021 and Officer Mott's surgery in January of this year, Officer Mott worked a highly physical and dangerous job as a law enforcement officer: first in Washington, D.C., and then in Grand Rapids, Michigan. Trial Tr. 7/29/24 at 114:07-116:07. Officer Mott's injury could be traceable to any of the assortment of emergencies, stops, and arrests he was involved in during the intervening three years. *See* 115:20-116:07. Given that Officer Mott's dominant hand is his left hand, it seems especially unlikely that he went several years working in law enforcement with a severe injury to his left wrist. *See* Trial Tr. 7/29/24 at 101:8-9.

Finally, the Court should note that Mr. Harrington's pole was about a pound a half, making it even less likely that it caused a severe injury. *See* Trial Tr. 7/31/24 at 6:01-05.

In light of these facts, the government cannot establish that Mr. Harrington caused Officer Mott's injury by a preponderance, so the Court should not apply any sentencing enhancements premised on the causation of bodily injury.

### e. The government cannot establish that Mr. Harrington used his flagpole as a dangerous weapon by a preponderance of the evidence

As the Court noted while rendering its trial verdict, the government makes two arguments that Mr. Harrington used his flagpole as a dangerous weapon: (1) if Mr. Harrington's flagpole in fact inflicted serious bodily injury on Officer Mott, then he clearly used it in a manner capable of causing serious bodily injury, Trial Tr. 7/31/2024 at 4:20-23; and (2) regardless of injury, the flagpole was otherwise capable of inflicting serious bodily injury. As to the first argument, the defense maintains that Mr. Harrington did not cause Officer Mott's injuries for the reasons stated above.

As to the second argument, the government has still not shown that Mr. Harrington's pound-and-a-half aluminum pole was otherwise capable of causing serious bodily injury. In its sentencing position, the government offers an affidavit from Officer Mott's wrist surgeon, Dr. Viet Do. (Gov. SPP at 29-30). In this affidavit, Dr. Do merely confirms that it is *possible* that Officer Mott's injury was caused by someone striking his baton, a statement that the defense does not contest. Notably, however, Dr. Do did not state that he examined Mr. Harrington's flagpole, even though that piece of evidence is currently in the government's custody. (Gov. SPP, Dr. Viet Do's Affidavit). Thus, Dr. Do's statements do not have any bearing on whether Mr. Harrington's flagpole was *otherwise* capable of inflicting serious bodily injury. They do not concern the specifics of Mr. Harrington's flagpole at all.

For these reasons, the Court should not impose enhancements premised on using the flagpole as a deadly or dangerous weapon.

### B.    Objection to Adjustment for Obstruction of Justice Under USSG § 3C1.1

Mr. Harrington objects to the allegation that he provided "materially false testimony" during trial and to the suggested application of a two-level enhancement for obstruction of justice under USSG § 3C1.1.  In the context of USSG §3C1.1, the government must meet its burden of proof by the "clear-and-convincing" standard, and the evidence must be evaluated "in the light most favorable to the defendant."  *United States v. Montague*, 40 F.3d 1251, 1253 (D.C. Cir. 1994) (holding that a "preponderance of the evidence" standard is insufficient).  The higher standard reflects the fact that a defendant has a constitutional right to testify, *id.* at 1254, and "not every accused who testifies at trial and is convicted will incur an enhanced sentence . . . for committing perjury."  *United States v. Dunnigan*, 507 U.S. 87, 95-96 (1993).  Lower courts must make "independent findings necessary to establish a willful impediment to or obstruction of justice, or an attempt to do the same, under" the definition of perjury. *Id*. In the context of this enhancement, the Supreme Court has held that "[a] witness testifying under oath or affirmation [commits perjury] if she gives false testimony concerning a material matter with the willful intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory." Thus, for this enhancement to apply, the government must prove by clear and convincing evidence that Mr. Harrington committed perjury, *id.*, and not merely that some aspects of his testimony might have come across as inconsistent or in conflict under the pressure of cross examination.

The government first contends that Mr. Harrington committed perjury by testifying that he initially swept his flagpole upward and downward to grab the officers' attention. (Gov. SPP at

30-31). The government bases its argument on two statements that have been taken out of context: Mr. Harrington's statement that he swept his flagpole upward in order to get the officers' attention (located at Trial Tr. 7/30/2024 at 18:17-19:11), and his similar statement that he swept the flagpole upward because he "just wanted to let [the officers] know, let us have some space," (located at Trial Tr. 7/30/2024 at 19:17-18).

Crucially, Mr. Harrington swept his flagpole upward in the direction of the police line multiple times, and neither of the two statements that the government homes in on concern the instance in which Mr. Harrington connected with Officer Mott's baton or helmet. That is, the government is not quoting portions of the transcript concerning Mr. Harrington's assault of Officer Mott; they concern the actions Mr. Harrington took *before* the assault. These statements concern an instance in which Mr. Harrington swept his flagpole up-and-down at a distance from the officers, standing a few feet back from the police line where he could not have hit the officers. *See* Trial Tr. 7/30/2024 at 19:5-15. In fact, when Mr. Harrington testified that he "just wanted to let [the officers] know, let us have some space," (one of the statements that the government claims is perjurious), he was explaining why he swept his flagpole up and down into the clear air without trying to hit anyone. *Id.* Why does this matter? Mr. Harrington's testimony about his initial sweep of the flagpole, the sweep that connected with no one, is not contradicted by the fact that he was ultimately convicted of assaulting Officer Mott. It can be both true that Mr. Harrington initially swept his flagpole up and down to grab the officers' attention, and then later assaulted Officer Mott while intervening with the police officers who had repelled a demonstrator down the stairs.

Further supporting Mr. Harrington's testimony on this point, Mr. Harrington initially swept the flagpole upward shortly after he had made a hand gesture at the police line that clearly

*was* aimed at getting the officers' attention. Trial Tr. 7/30/2024 at 16:24-17:15. In light of this sequence of events, Mr. Harrington's testimony makes sense: first he motioned at the officers with his hand to get their attention, then he swept his flagpole up and down at a distance for the same purpose, and later he *stepped forward* in response to the officers repelling a protestor down the steps. Because Mr. Harrington's testimony on this point coheres with his record and does not contradict the fact that he eventually assaulted Officer Mott, the government has not demonstrated that it is perjurious by clear and convincing evidence.

The government's second run at identifying a perjurious statement falls flat. The government claims that Mr. Harrington committed perjury while testifying about his connection to the Proud Boys, but the government has not shown that this testimony was false or material. To start, the government simply has not identified a false statement. As the government portrays in its briefing, Mr. Harrington testified that he expressed interest in joining the Proud Boys in early December, but elected not to join at some point before the January 6 demonstration. (Gov. SPP at 31-32). The government asserts that Mr. Harrington's text messages contradict this timeline, but that is untrue. The government leans heavily on the text messages in Exhibit 508 to support its claim that Mr. Harrington actually was a member of the Proud Boys as of January 6, 2021, (Gov. SPP at 32), but all of these text messages were sent between December 13 and December 19, Trial Tr. 7/30/24 at 83:21-24. These text messages were sent during the period of time in which Mr. Harrington considered joining the Proud Boys, before deciding to withdraw after further discussion with his pastor and loved ones.

The government also highlights Mr. Harrington's statement on January 4, 2021 that "we got funds for [Enrique Tarrio's] defense," but it fails to demonstrate the falsity of this statement for at least two reasons. First, Mr. Harrington did not say that he is a member of the Proud Boys

in this statement. He merely states that he was involved in raising funds for Enrique Tarrio, a man apparently affiliated with the Proud Boys.[2] And Mr. Harrington was clear on cross that while he chose not to join the Proud Boys, he still was supportive of some of their members. Trial Tr. 7/30/2024 at 37:17-21. Second, even if this January 4 message said something to the effect of, "I am a member of the Proud Boys," the timeline is still consistent with Mr. Harrington's testimony that he withdrew sometime before the January 6 demonstration. *See* Trial Tr. 7/30/2024 at 97:12-99:2.

Furthermore, the government's argument concerning the Proud Boys hangs on the contention that the Court should take Mr. Harrington's private text messages as a clearer statement of reality than the testimony he gave under oath. This claim is specious as a matter of common sense generally, since many people are more prone to lie in a text or social media post than while under oath facing penalty of perjury. This claim is certainly incorrect as it pertains to Mr. Harrington, who clarified throughout his testimony that, like many people, he often uses text messages and social media posts to blow off steam and occasionally boast, rather than to provide an accurate account of his real intentions and actions. *See, e.g.* Trial Tr. 7/30/24 at 35:15-25; 99:04-25.

Finally, Mr. Harrington's statements about the Proud Boys, exaggerated or not, are not material to the case at hand. At trial, the Court admitted Mr. Harrington's text messages regarding the Proud Boys "in a narrow manner" because they had "some minor impeachment relevance on the Proud Boys issue," not because they had bearing on Mr. Harrington's underlying charges. Trial Tr. 7/30/24 at 85:21-23.

---

[2] However, it is worth noting that the government did not provide evidence at trial concerning Enrique Tarrio himself or any affiliation he has with the Proud Boys.

Because the government cannot demonstrate by clear and convincing evidence that Mr. Harrington committed perjury, the Court should not impose the two-level obstruction of justice enhancement under USSG § 3C1.1.

**C.    The Correct Guidelines Range**

Given the above arguments, the guidelines should be calculated as follows. The defense agrees that Counts 1, 3, and 6 group; that Counts 4 and 5 form a separate group; and that the guidelines do not apply to the misdemeanors in Counts 7 and 8. (PSR ¶¶ 55-57). The defense also agrees that Mr. Harrington falls in criminal history category I. (PSR ¶ 82).  As to Group One, the Court should apply a **base offense level of 14** under Section 2A2.2(a). *See also* USSG § 2A2.4(c)(1). The Court should then apply a **six-level adjustment for official victim** under Section 3A1.2(b). **For Group One, then, the adjusted offense level is 20**.

As to Group Two, the Court should apply a **base offense level of 10** under Section 2A2.4(a). No other adjustments or specific offense characteristics apply, so **for Group Two, the adjusted offense level is 10.** Because Group Two's adjusted offense level is more than nine levels below the adjusted offense level for Group One, Group Two should be disregarded. USSG § 3D1.4.

Thus, at **criminal history category I and total offense level 20, the guideline range is 33-41 months.**

**IV.    SENTENCING FACTORS UNDER 18 U.S.C. § 3553(a)**

The "overarching" directive of sentencing is that the court shall "impose a sentence sufficient, but not greater than necessary," to comply with the purposes of sentencing. *Kimbrough v. United States*, 552 U.S. 85, 101 (2007) (citations omitted). This command reflects the "uniform and constant . . . tradition . . . to consider every convicted person as an individual

and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Gall v. United States*, 552 U.S. 38, 52 (2007) (citations omitted). Underlying this notion "is the principle that the punishment should fit the offender and not merely the crime." *Pepper v. United States*, 562 U.S. 476, 487-88 (2011) (citations omitted). In short, this Court must try to understand all of the relevant context before imposing a sentence. *See id.* (explaining that it is "essential . . . to [the] selection of an appropriate sentence" for the court to be "in the possession of the fullest information possible concerning the defendant's life and characteristics").

**A.    Mr. Harrington's History and Characteristics**

**a.  Mr. Harrington has dedicated his life to the service of others**

**i.  Military Service**

Mr. Harrington was born in Texas in 1955 to Robert Bruce Harrington and Joan Ann Wykes. (PSR ¶ 88). At his sentencing hearing, he will be 69 years old. Due to his father's busy work schedule, Mr. Harrington and his two younger siblings were raised primarily by their mother, who ran her own business pet-sitting and training dogs for service with law enforcement and the military. (PSR ¶¶ 87-89). From a young age, he remembers admiring both his mother's work ethic and the way in which her business supported local law enforcement and military servicemen abroad.

Shortly after turning 18, Mr. Harrington enlisted in the Navy during the Vietnam War. He served with the Navy on the aircraft carrier USS Midway from 1974 to 1979. (PSR ¶ 102). Mr. Harrington was honorably discharged and earned the National Defense Service Medal, Armed Forces Expeditionary Medal (Vietnam), and Navy Unit Commendation during this term. (PSR ¶ 123). During this term of service, Mr. Harrington became passionate about understanding how

planes operate and began to consider a career as an electrician. He obtained trainings in aviation and electronics, providing the foundation for the rest of his career.

After living abroad for a few years and establishing a career as an electrician, Mr. Harrington re-enlisted as a Navy reservist in 1992 at the age of 37. (Exh. A). He served in this position for over 20 years, ultimately transferring to Retired Reserve status on May 2015. (PSR ¶ 126). In the course of his career as a reservist, Mr. Harrington was called to serve on active duty in Iraq twice: once from January 20, 2003 to August 3, 2003, and once from July 11, 2005 to August 18, 2006. (PSR ¶¶ 124-125). During these tours, he served in active combat zones supporting Operations Noble Eagle, Enduring Freedom, and Iraqi Freedom. (PSR ¶¶ 124-125).

Although this service record is impressive in and of itself, Mr. Harrington's military record becomes even more impressive in light of the evaluations he received during his career as a reservist. (*See* Exh. S). Mr. Harrington's evaluations consistently reference his willingness to donate his professional expertise, money, and time beyond what was required of him in order to ensure military projects were completed at a high level of excellence. Some of Mr. Harrington's reviews reference specific monetary amounts that he saved the government by donating his time and resources. Adding these monetary amounts together, Mr. Harrington saved the government at least $571,184 by donating his own time and money to military projects. (Exh. S at 2, 4, 12, 14, 18, 20, 22, 24). Because not all of Mr. Harrington's evaluations specify the exact amount of money he saved the military through donating his time, it is likely that Mr. Harrington saved the government well in excess of this amount.

Finally, Mr. Harrington received a host of awards and commendations in the course of his military service, including six Navy & Marine Corps Achievement Medals and a Seabee Combat Warfare insignia. (Exh. T). In combination with Mr. Harrington's decades of service and sterling

evaluations, these awards speak to Mr. Harrington's deep devotion to his country. Military service was not a box he checked off in the course of his career, but a vocation that he pursued with passion and excellence, often giving well beyond what was required of him.

### ii. Family

As proud as Mr. Harrington may be of his military service, his most significant source of pride is in his role as a father to his children. After serving in the Vietnam War, Mr. Harrington met Siemonna Nunez in the Philippines and quickly fell in love. They were married in 1984 and had two children together: Joshua Harrington and Sherrell Harrington. (PSR ¶ 96). Although Mr. Harrington and Ms. Nunez divorced in 1989, they maintained a friendly relationship and supported one another raising Joshua and Sherrell. (PSR ¶ 96). Joshua and his wife run a business flipping house in San Jose, California, where they live with their two children. (PSR ¶ 97). Sherell lives in Riverbank, California with her husband and two children, where she works for Tesla as a robotics engineer. (PSR ¶ 98). Mr. Harrington and his two adult children frequently send Bible verses and words of encouragement to each other, so that they can stay in touch even while living apart. (PSR ¶ 99). Both Joshua and Sherrell have written moving letters about the positive impact their father has had throughout their lives. (Exhs. B-C). As his son Joshua writes, Mr. Harrington acts as "pillar of strength and goodness in the lives of those who know him", (Exh B).

While furthering his education as an electrician in California, Mr. Harrington met his wife Deneise Harrington on the day of the 1989 Loma Prieta Earthquake, and they were married in 1992. (Exh D - Deneise Harrington Letter; *see also* PSR ¶ 100). When they met, Ms. Harrington (then Deneise Thomas) was working at the front desk of a Wells Fargo branch, but she had always dreamt of entering the medical profession. With Mr. Harrington's

encouragement, she finished nursing school and spent much of her career providing hospice care for those suffering from terminal illnesses. Tragically, Ms. Harrington's career ended early in 2013 when she was diagnosed with multiple sclerosis. (PSR ¶ 100). This disease has caused Ms. Harrington's health to decline significantly in recent years. As of the present, she has been diagnosed with a litany of conditions in addition to severe MS, including Bipolar Affective Disorder, Cardiomegaly (enlarged heart), Renal Insufficiency, IBS, Depression, Anxiety, Hypothyroidism, and Neuropathy from Type 2 Diabetes. Mr. Harrington spends much of his time caring for Ms. Harrington, ensuring she takes all 12 of her prescriptions on time, driving her from their home in Wyoming to her medical specialist in California, cooking her meals, and maintaining their shared home. Although their relationship has weathered difficult moments, Mr. Harrington has always stepped up to provide Deneise the care she needs, and she writes lovingly about his support in her letter to the Court. (Exh. B).

To be clear, Mr. Harrington's marriage with Deneise has not been perfect. In 2007, Mr. Harrington began an affair with Kyung Jackson. (PSR ¶ 101). Although both Mr. Harrington and Ms. Jackson deeply regret their actions, they are grateful for the resulting birth of their son, Isaiah. (PSR ¶ 101). Mr. Harrington, Ms. Harrington, and Ms. Jackson have committed to working together to raise Isaiah, as difficult as that may be at moments. (Exh. E - Kyung Jackson Letter). Isaiah has been diagnosed with severe autism, ADHD, and ADD. (PSR ¶ 101). These diagnoses made traditional schooling difficult for Isaiah, so Mr. Harrington decided to homeschool him as of 2019. (PSR ¶ 101; *see also* Exh. A). When Mr. Harrington and Ms. Harrington moved to Wyoming, Ms. Jackson relocated to Wyoming as well so she could continue being involved in Isaiah's life. On top of her full-time job as a caretaker and her own medical issues, Ms. Jackson contributes to taking care of Isaiah and Ms. Harrington when she is

able. (PSR ¶ 101). Isaiah is thankful to be raised with the loving support of multiple adults, and he is especially grateful for his father, Mr. Harrington. (Exh. F - Isaiah Letter).

### iii. Career & Community Service

Finally, when considering Mr. Harrington's personal history and characteristics, the Court should consider his remarkable commitment to the service of others, demonstrated in both his career and community involvement. After Mr. Harrington finished his service in Vietnam and his education in the Philippines and Japan, he moved back to the United States and began a career as an electrician. He started working at Cupertino Electric in San Jose, California in 1994, and he continued working there until 2017, when Ms. Harrington's MS became so severe that she required full-time care. (PSR ¶ 122). Mr. Harrington's colleagues respected his "work ethic, punctuality, pride in his work, and positive outlook." (Exh. G - Parkyn Letter). Outside of working hours, Mr. Harrington also volunteered to help his colleagues with home projects, further demonstrating his commitment to bettering the lives of those around him. (Exh. H - Lochner Letter).

In addition to his impressive military service and career as an electrician, Mr. Harrington has also dedicated a significant amount of his personal time to serving vulnerable members in his community. Mr. Harrington's reservist evaluations frequently commended his non-military service to others. Between March of 1997 and March of 1998, Mr. Harrington received an Outstanding Citizen award from East Palo Alto City Council and a Certificate of Achievement from East Palo Alto Chief of Police because of his community service. (Exh. S at 4). He volunteered with foster children, teaching them work ethics, self-esteem, goal setting, ranch work, and horse riding. (Exh. S at 6). He also provided his community with pro bono electrical

work through his private electrical contracting company. (Exh. S at 8). This included helping the elderly in his community with pro bono home repair. (Exh. S 14, 24).

Since retiring from the Navy Reserves, Mr. Harrington has remained as active as ever serving his community. In Wyoming, Mr. Harrington frequently travels to the homes of elderly and low-income members of his church community so that he can perform plumbing, electrical work, and basic home repairs for those who do not have the ability or resources to complete these projects themselves. Several people have written letters in support of Mr. Harrington, explaining the impact that his service and leadership has had on his neighbors in Wyoming and California. (Exhs. I-M). He also leads repair projects at a local church, even though he does not personally attend their services, and brings Isaiah along to teach him the value of hard work. (Exhs. N-Q). Mr. Harrington provides all of this work free of charge.  Now that his service in the military is over, Mr. Harrington sees these volunteer projects as another way to fulfill his vocation of using his skills and intellect to serve his God, country, and neighbor.

### b. Mr. Harrington's lack of criminal history, age, and post-offense rehabilitation demonstrate that he poses little risk of reoffending

Furthermore, Mr. Harrington poses little risk of recidivating, given several of his characteristics.  To start, Mr. Harrington has no criminal history points. (PSR ¶ 82). In a study tracking recidivism rates among federal defendants, the United States Sentencing Commission found that defendants with zero criminal history points are the least likely to recidivate.[3]  The rearrest rate generally for zero-point offenders was 26.8%, significantly lower than the rearrest rate for defendants with even one criminal history point, which is 42.3%.[4]

---

[3] United States Sent'g Comm'n, *Recidivism of Federal Offenders Released in 2010* at 25-29 (Sept. 2021), available at https://tinyurl.com/3sr6hw6w.

[4] *Id.* at 26.

As a man in his late 60s, Mr. Harrington's risk of reoffending is even lower. The Sentencing Commission has consistently found that age, along with criminal history, is one of the strongest predictors of the likelihood that a person will recidivate.[5] And someone who is older than 60, like Mr. Harrington, poses by far the lowest risk of re-offending. While someone released in their 20s poses a 64.4% chance of reoffending, someone who is released at over the age of 60 poses only a 15.9% chance of reoffending.

Mr. Harrington's risk of recidivating decreases even further when you consider his criminal history in combination with his age. As the Sentencing Commission writes, "Separately, age and criminal history are consistent predictors of recidivism. Considered together, they are even better predictors of recidivism."[6] **Given that Mr. Harrington is in CHC I and over 60 years old, his likelihood of reoffending is 9.4%.**

These statistics are unsurprising, given Mr. Harrington's behavior since the instant offense. Since January 6, 2021, Mr. Harrington has avoided committing any new crimes, has not attended a rally or public demonstration since, and has complied with all his conditions of pretrial release. (PSR ¶ 9). He spends his days taking care of Ms. Harrington and Isaiah, completing service projects for the poor and elderly in his community, managing his property, and attending church. He regrets the mistakes he made over three years ago and has no intention of ever doing anything remotely similar again. (*See* Exhs. A, E, K, P, Q). Given his remarkable military career, his consistent involvement in community service, his clear concern for his family, his lack of criminal history, and his age, the odds of Mr. Harrington ever recidivating again are vanishingly slight.

---

[5] *Id.* at 24-25.

[6] *Id.* at 29.

### c.  Mr. Harrington will be unable to provide his wife and son necessary full-time care while in custody

As noted above, both Ms. Harrington and Isaiah live with severe disabilities that require full-time, live-in care. Currently, Mr. Harrington fulfills nearly all of these responsibilities by himself. The PSR notes that Ms. Jackson provides some caretaking assistance when she is able, but she is unable to provide anything near the necessary care on her own. She works a full-time job and is facing serious medical issues of her own that have led to multiple hospital visits in the preceding year. (PSR ¶ 101). Ms. Harrington and Isaiah simply will not receive the care they need for any amount of time that Mr. Harrington spends in custody. (Exhs. D-F, R).

Mr. Harrington recognizes that due to the nature of his mistakes, he will need to spend some time in custody paying for his past wrongs. When imposing a custodial sentence, however, the Court should consider that Mr. Harrington's commitment to his family is mitigating and that any sentence he receives will punish Ms. Harrington and Isaiah as well. The defense agrees with the PSR that this fact warrants a downward variance. (PSR ¶ 181).

Based on the medical needs of his family, **probation has recommended that the Court vary beneath the PSR's recommended guideline range by 15 months**. (Dkt. 49 at 1). The defense agrees that a 15-month variance beneath the guideline range is appropriate. **Starting with the correct guideline range of 33-41 months, the defense likewise recommends a 15-month downward variance, resulting in a custodial sentence of 18 months.**

### B.  Nature and Circumstances of the Offense, Unwarranted Sentencing Disparities, and Deterrence

Mr. Harrington understands, that notwithstanding his growth efforts, his actions have consequences. For that reason, he requests that the Court impose a sentence that includes a term

of 18 months imprisonment. The government recommends a sentence of 96 months, based on an incorrectly calculated guidelines range.  Even if the range were calculated correctly, such sentencing recommendations are astonishingly high for a defendant of Mr. Harrington's level of culpability; they would place him in the same league as the very worst January 6 actors and punish him more harshly, in some instances, than persons who clearly had a more involved role.[7] Such a result would be plainly unfair and inappropriate when considering that, unlike with many of the worst defendants, there is no evidence that Mr. Harrington:

- Ever breached the Capitol building;

- Played a lead role in causing the crowds to breach into the Capitol building and other restricted grounds;

- Brought a firearm, zip-ties, rope, or any other equipment intended to be used against law enforcement or members of government;

- Rallied the crowd to target specific members of government;

- Conspired with others to travel to Washington, D.C., on January 6, with the intent to cause disruption or violence; or

- Intimidated potential witnesses during the course of the government's investigation.[8]

In its sentencing position and the presentation of its case at trial, the government has emphasized the concerning text messages and social media posts that Mr. Harrington has made concerning the January 6 demonstration, but the defense encourages the Court to weigh these messages with Mr. Harrington's actions. However much Mr. Harrington boasted and postured

---

[7] *See* https://www.pbs.org/newshour/nation/jan-6-rioter-known-as-qanon-shaman-sentenced-to-41-months

[8] *See* https://www.washingtonpost.com/dc-md-va/2022/08/01/reffitt-sentence-jan6/

online, at the end of the day, when he drove to the January 6 demonstration, he left his weapons at home and brought his family. He did not purchase a painter's mask until he arrived in DC, realizing that there was a threat of tear gas. Given his multiple active duty tours, Mr. Harrington knows how to prepare for war, and whatever ridiculous statements he made on the internet, he simply did not drive to DC in January 2021 like someone preparing for war.

All that said, Mr. Harrington made some grave mistakes in the heat of the January 6 demonstration, mistakes that he knows warrant punishment. There is no excuse for swinging a flagpole at peace officers, rushing the police line behind an opaque barrier, or pushing against a riot shield. However, viewed in the context of Mr. Harrington's life, these mistakes were clearly anomalous. Mr. Harrington spent over 60 years of his life evincing nothing but respect for the law and for law enforcement particularly, and in the nearly four years that have transpired since January 6, 2021, he has not engaged in any similar misconduct. He has learned from his mistakes, and the Court should have little fear that he will ever commit a similar crime again.

On balance, a sentence of 18 months imprisonment is sufficient to punish him for his conduct and to adequately promote respect for the law when all these factors are balanced.

## V.    RESTITUTION, SPECIAL ASSESSMENTS, AND FINES

Mr. Harrington does not intend to contest the restitution amount of $2,000 and has no objection to the imposition of the mandatory special assessments. Mr. Harrington agrees with the USPO, however, that "[b]ased upon [his] financial profile, a fine is not recommended." (Dkt. 49 at 2). As noted in the PSR, Mr. Harrington's expenses exceed his monthly income, he is retired, and he is responsible for paying for his wife's ongoing medical treatment. (PSR ¶¶ 127, 140). All these factors establish that Mr. Harrington is unable to pay a fine in addition to restitution.

## VI.     SELF-SURRENDER

Finally, Mr. Harrington agrees with USPO that he is "a good candidate for voluntary surrender as he is compliant with the conditions of his release, has appeared for all scheduled Court appearances, and is not an apparent flight risk or a danger to the community." (Dkt. 49 at 3). Mr. Harrington requests a 60-day surrender. Mr. Harrington has several dental appointments scheduled over the next several months to receive permanent dental implants, the latest of which is scheduled for January 7, 2025. 60 days will allow Mr. Harrington to receive the dental care he needs before beginning his custodial term. (Exh. U).

## VII.     CONCLUSION

Mr. Harrington respectfully requests that the Court sentence him to a term of imprisonment of 18 months, two years of supervised release, and $2,000 in restitution.

Respectfully submitted,

DATED:  November 20, 2024          /s/ Jake Crammer

Lisa LaBarre (Cal. Bar No. 246429)
Email: Lisa_Labarre@fd.org
Jake Crammer (Cal. Bar No. 329928)
Email: Jake_Crammer@fd.org
Deputy Federal Public Defenders
Federal Public Defender for C.D. Cal.
321 East 2nd Street
Los Angeles, CA 90012
Telephone:  (213) 894-2854
Facsimile:  (213) 894-0081